UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**13 CIV 6516**

DNAML PTY, LIMITED,

          Plaintiff,

       v.

APPLE, INC.; HACHETTE BOOK GROUP,
INC.; HARPERCOLLINS PUBLISHERS,
L.L.C.; VERLAGSGRUPPE GEORG VON
HOLTZBRINCK GMBH; HOLTZBRINCK
PUBLISHERS, LLC d/b/a MACMILLAN;
THE PENGUIN GROUP, A DIVISION OF
PEARSON PLC.; and SIMON &
SCHUSTER, INC.

          Defendants.

CASE NO.:

**COMPLAINT FOR VIOLATIONS OF:**

**THE SHERMAN ACT (15 U.S.C. § 1)**

**JURY TRIAL DEMANDED**



1.    This Complaint is filed and these proceedings are instituted against the above-named Defendants under Section 1 of the Act of July 2, 1890, commonly known as the Sherman Antitrust Act (15 U.S.C. §1) to recover damages for injuries to the business and property of Plaintiff DNAML PTY, LIMITED.

## INTRODUCTION

2.    This case is about an already proven conspiracy to fix prices and reduce competition in the rapidly expanding "e-book" industry between Apple and the Publisher Defendants. An e-book is a book that is sold to consumers in electronic form to be read on a variety of electronic devices. As was uncovered in the Department of Justice's investigation into the conspiracy, the Publisher Defendants saw the rising demand for e-books and Amazon's low-pricing practices as undermining the traditional business model in the industry. In a nutshell, the Publisher Defendants did not want consumers to perceive the value of a new book as being only

1

$9.99 (or lower). Accordingly, the Publisher Defendants joined forces with Apple—who was about to enter the e-book market—to restrain price competition in the sale of e-books. As phrased by Apple CEO Steve Jobs: "We'll go to [an] agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway." Almost simultaneously, each of the publishers entered into a functionally identical agency agreement with Apple that would "chang[e] the industry permanently." And it did. After the Publisher Defendants executed the new agreements with Apple, each quickly imposed the same agreements on all other retailers. This eliminated retailers' ability to compete on price. The government's allegations, which it proved at trial, are explained in detail in this Complaint.

3.      Consumers have paid tens of millions of dollars more for e-books since the price-fixing conspiracy commenced. But Defendants' conduct did not solely result in injury to consumers. Competition was also harmed because Defendants' price fixing artificially restrained the ability of other e-book sellers to compete in the market. Plaintiff DNAML was one such competitor. DNAML, an independent software developer and e-book distributor, did not have a dedicated e-reader such as the Kindle, Nook, or iPad. Instead, the draw to DNAML was that it priced aggressively and offered innovative retail methods such as bundling several e-books together or offering discounted—or even free—e-books to consumers that purchased other software products from DNAML. These practices incentivized consumers to purchase and download e-books from DNAML's websites and then access their e-books on another e-reader, mobile phone, personal computer, or laptop computer. Once Apple and the Publisher Defendants entered into their price-fixing agreement, however, DNAML was no longer able to offer attractive discounted prices or unique retail sales methods, and DNAML was forced to cease its e-book retail operations.

4.    Moreover, in order to further insulate itself from price competition and eliminate transparency in e-book pricing, Apple would not allow DNAML and others to offer its app in the Apple App Store without charging a 30 percent commission on all e-book sales, an amount that was uneconomic and non-competitive because the agency agreements allowed for only 30 percent margins on sales of e-books.  DNAML brings the present suit to vitiate Defendants' unlawful conduct.

## THE PARTIES

5.    DNAML is a corporation organized and existing under the laws of Australia, having a principal place of business in Sydney New South Wales, Australia.

6.    Apple, Inc. has its principal place of business at 1 Infinite Loop, Cupertino, CA 95014. Among many other businesses, Apple, Inc. distributes e-books through its iBookstore.

7.    Hachette Book Group, Inc. has its principal place of business at 237 Park Avenue, New York, NY 10022. It publishes e-books and print books through publishers such as Harper and William Morrow.

8.    Holtzbrinck Publishers, LLC d/b/a/ Macmillan has its principal place of business at 175 Fifth Avenue, New York, NY 10010. It publishes e-books and print books through publishers such as Farrar, Straus and Giroux and St. Martin's Press. Verlagsgruppe Georg von Holtzbrinck GmbH owns Holtzbrinck Publishers, LLC d/b/a/ Macmillan and has its principal place of business at Gänsheidestraße 26, Stuttgart 70184, Germany.

9.    Penguin Group (USA), Inc. has its principal place of business at 375 Hudson Street, New York, NY 10014. It publishes e-books and print books through publishers such as The Viking Press and Gotham Books. Penguin Group (USA), Inc. is the United States affiliate of The Penguin Group, a division of Pearson plc, which has its principal place of business at 80 Strand, London WC2R 0RL, United Kingdom.

3

10.    Simon & Schuster, Inc. has its principal place of business at 1230 Avenue of the Americas, New York, NY 10020. It publishes e-books and print books through publishers such as Free Press and Touchstone.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4 and 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.    This Court has personal jurisdiction over each Defendant, and venue is proper in the Southern District of New York under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, because each Defendant transacts business and is found within the Southern District of New York. The U.S. component of each Publisher Defendant is headquartered in the Southern District of New York, and acts in furtherance of the conspiracy occurred in this District. Many thousands of the Publisher Defendants' e-books are and have been sold in this District, including through Defendant Apple's iBookstore.

## INTERSTATE COMMERCE

13.    Defendants are engaged in, and their activities substantially affect, interstate trade and commerce. The Publisher Defendants sell e-books throughout the United States, and these sales represent a substantial amount of interstate commerce. For example, in 2010, U.S. consumers paid more than $300 million for the Publisher Defendants' e-books. This figured includes more than $40 million for e-books licensed through Defendant Apple's iBookstore.

## UNNAMED CO-CONSPIRATORS

14.    Various persons, who are known and unknown to DNAML, and not named as defendants in this action, including senior executives of the Publisher Defendants and Apple, have participated as co-conspirators with Defendants in the offense alleged and have performed acts and made statements in furtherance of the conspiracy.

## FACTUAL ALLEGATIONS

### I.    THE CONSPIRACY AS PROVEN BY THE U.S. GOVERNMENT AGAINST APPLE

15.    The following is taken from the U.S. Department of Justice's Complaint filed on April 11, 2012 in this Court. The Publisher Defendants settled with the DOJ prior to trial. The DOJ prevailed in a bench trial against Apple in front of the Honorable Judge Cote. Judge Cote issued the Court's detailed Opinion and Order on July 10, 2013 and entered its Judgment on September 5, 2013. The restraint alleged by DNAML is identical in virtually all respects to the one proven by the DOJ.

### A.    The Publishing Industry

#### 1.    Print Books

16.    Authors submit books to publishers in manuscript form. Publishers edit manuscripts, print and bind books, provide advertising and related marketing services, decide when a book should be released for sale, and distribute books to wholesalers and retailers. Publishers also determine the cover price or "list price" of a book, and typically that price appears on the book's cover.

17.    Retailers purchase print books directly from publishers, or through wholesale distributors, and resell them to consumers. Retailers typically purchase print books under the "wholesale model." Under that model, retailers pay publishers approximately one-half of the list price of books, take ownership of the books, then resell them to consumers at prices of the retailer's choice. Publishers have sold print books to retailers through the wholesale model for over 100 years and continue to do so today.

#### 2.    E-books

18.    E-books are published in electronic formats. E-book publishers avoid some of the expenses incurred in producing and distributing print books, including most manufacturing expenses, warehousing expenses, distribution expenses, and costs of dealing with unsold stock.

19.    Consumers purchase e-books through websites of e-book retailers or through applications loaded onto their reading devices. Such electronic distribution allows e-book retailers to avoid certain expenses they incur when they sell print books, including most warehousing expenses and distribution expenses.

20.    From its very small base in 2007 at the time of Amazon's Kindle launch, the e-book market has exploded, registering triple-digit sales growth each year. E-books now constitute at least ten percent of general interest fiction and non-fiction books (commonly known as "trade" books[1]) sold in the United States and are widely predicted to reach at least 25 percent of U.S. trade book sales within two to three years.

### 3.    Publisher Defendants and "The $9.99 Problem"

21.    The Publisher Defendants compete against each other for sales of trade e-books to consumers. Publishers bid against one another for print- and electronic-publishing rights to content that they expect will be most successful in the market. They also compete against each other in bringing those books to market. For example, in addition to price-setting, they create cover art and other on-book sales inducements, and also engage in advertising campaigns for some titles.

22.    The Publisher Defendants are five of the six largest publishers of trade books in the United States. They publish a vast majority of their newly released titles as both print books

---

[1] Non-trade e-books include electronic versions of children's picture books and academic textbooks, reference materials, and other specialized texts that typically are published by separate imprints from trade books, often sold through separate channels, and are not reasonably substitutable for trade e-books.

and e-books. Publisher Defendants compete against each other in the sales of both trade print books and trade e-books.

23.    When Amazon launched its Kindle device, it offered newly released and bestselling e-books to consumers for $9.99. At that time, Publisher Defendants routinely wholesaled those e-books for about that same price, which typically was less than the wholesale price of the hardcover versions of the same titles, reflecting publisher cost saving associated with the electronic format. From the time of its launch, Amazon's e-book distribution business has been consistently profitable, even when substantially discounting some newly released and bestselling titles.

24.    To compete with Amazon, other e-book retailers often matched or approached Amazon's $9.99-or-less prices for e-book versions of new releases and *New York Times* bestsellers. As a result of that competition, consumers benefited from Amazon's $9.99-or-less e-book prices even if they purchased e-books from competing e-book retailers.

25.    The Publisher Defendants feared that $9.99 would become the standard price for newly released and bestselling e-books. For example, one Publisher Defendant's CEO bemoaned the "wretched $9.99 price point" and Penguin USA CEO David Shanks worried that e-book pricing "can't be $9.99 for hardcovers."

26.    The Publisher Defendants believed the low prices for newly released and bestselling e-books were disrupting the industry. The Amazon-led $9.99 retail price point for the most popular e-books troubled the Publisher Defendants because, at $9.99, most of these e-book titles were priced substantially lower than hardcover versions of the same title. The Publisher Defendants were concerned these lower e-book prices would lead to the "deflation" of hardcover book prices, with accompanying declining revenues for publishers. The Publisher Defendants

7

also worried that if $9.99 solidified as the consumers' expected retail price for e-books, Amazon and other retailers would demand that publishers lower their wholesale prices, further compressing publisher profit margins.

27.     The Publisher Defendants also feared that the $9.99 price point would make e-books so popular that digital publishers could achieve sufficient scale to challenge the major incumbent publishers' basic business model. The Publisher Defendants were especially concerned that Amazon was well positioned to enter the digital publishing business and thereby supplant publishers as intermediaries between authors and consumers. Amazon had, in fact, taken steps to do so, contracting directly with authors to publish their works as e-books—at a higher royalty rate than the Publisher Defendants offered. Amazon's move threatened the Publisher Defendants' traditional positions as the gate-keepers of the publishing world. The Publisher Defendants also feared that other competitive advantages they held as a result of years of investments in their print book businesses would erode and, eventually, become irrelevant, as e-book sales continued to grow.

### 4.     Publisher Defendants Recognize They Cannot Solve "The $9.99 Problem" Alone

28.     Each Publisher Defendant knew that, acting alone, it could not compel Amazon to raise e-book prices and that it was not in its economic self-interest to attempt unilaterally to raise retail e-book prices. Each Publisher Defendant relied on Amazon to market and distribute its e-books, and each Publisher Defendant believed Amazon would leverage its position as a large retailer to preserve its ability to compete and would resist any individual publisher's attempt to raise the prices at which Amazon sold that publisher's e-books. As one Publisher Defendant executive acknowledged Amazon's bargaining strength, "we've always known that unless other publishers follow us, there's no chance of success in getting Amazon to change its pricing

practices." In the same email, the executive write, "without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react. . . ."

29.      Each Publisher Defendant also recognized that it would lose sales if retail prices increased for only its e-books, while the other Publisher Defendants' e-books remained competitively priced. In addition, higher prices for just one publisher's e-books would not change consumer perceptions enough to slow the erosion of consumer-perceived value of books that all the Publisher Defendants feared would result from Amazon's $9.99 pricing policy.

**B.      Defendants' Unlawful Activities**

30.      Beginning no later than September 2008, the Publisher Defendants' senior executives engaged in a series of meetings, telephone conversations and other communications in which they jointly acknowledged to each other the threat posed by Amazon's pricing strategy and the need to work collectively to end that strategy. By the end of the summer of 2009, the Publisher Defendants had agreed to act collectively to force up Amazon's retail prices and thereafter considered and implemented various means to accomplish that goal, including moving under the guise of a joint venture. Ultimately, in late 2009, Apple and the Publisher Defendants settled on the strategy that worked—replacing the wholesale model with an agency model that gave the Publisher Defendants the power to raise retail e-book prices themselves.

31.      The evidence showing conspiracy is substantial and includes:

- Practices facilitating a horizontal conspiracy. The Publisher Defendants regularly communicated with each other in private mails to each other to exchange conversations, both in person and on the telephone, and in e-mails to each other to exchange sensitive information and assurance of solidarity to advance the ends of this conspiracy

- Direct evidence of a conspiracy. The Publisher Defendants directly discussed, agreed to, and encouraged each other to collective action to force Amazon to raise its retail e-book prices.

- <u>Recognition of illicit nature of communications</u>. Publisher Defendants took steps to conceal their communications with one another, including instructions to "double delete" e-mail and taking other measures to avoid leaving a paper trail.

- <u>Acts contrary to economic interests</u>. It would have been contrary to the economic interests of any Publisher Defendant acting alone to attempt to impose agency on all of its retailers and then raise its retail e-book prices. For example, Penguin Group CEO John Makinson reported to his parent company board of directors that "the industry needs to develop a common strategy" to address the threat "from digital companies whose objective may be to disintermediate traditional publishers altogether" because it "will not be possible for any individual publisher to mount an effective response," and Penguin later admitted that it would have been economically disadvantaged if it "was the only publisher dealing with Apple under the new business model."

- <u>Motive to enter the conspiracy, including knowledge or assurances that competitors also will enter</u>. The Publisher Defendants were motivated by a desire to maintain both the perceived value of their books and their own position in the industry. They received assurances from both each other and Apple that they all would move together to raise retail e-book prices. Apple was motivated to ensure that it would not face competition from Amazon's low-price retail strategy.

- <u>Abrupt, contemporaneous shift from past behavior</u>. Prior to January 23, 2010, all Publisher Defendants sold their e-books under the traditional wholesale model; by January 25, 2010, all Publisher Defendants had irrevocably committed to transition all of their retailers to the agency model (and Apple had committed to sell e-books on a model inconsistent with the way it sells the vast bulk of the digital media it offers in its iTunes store). On April 3, 2010, as soon as the Apple Agency Agreements simultaneously became effective, all Publisher Defendants immediately used their new retail pricing authority to raise the retail prices of their newly released and bestselling e-books to the common ostensible maximum prices contained in their Apple Agency Agreements.

1. **The Publisher Defendants Recognize a Common Threat**

32.    Starting no later than September of 2008 and continuing for at least one year, the Publisher Defendants' CEOs (at times joined by one non-defendant publisher's CEO) met privately as a group approximately once per quarter. These meetings took place in private dining rooms of upscale Manhattan restaurants and were used to discuss confidential business and

competitive matters, including Amazon's e-book retailing practices. No legal counsel was present at any of these meetings.

33.     In September 2008, Penguin Group CEO John Makinson was joined by Macmillan CEO John Sargent and the CEOs of the other four large publishers at a dinner meeting in "The Chef's Wine Cellar," a private room at Picholene. One of the CEOs reported that business matters were discussed.

34.     In January 2009, the CEO of one Publisher Defendant, a United States subsidiary of a European corporation, promised his corporate superior, the CEO of the parent company, that he would raise the future of e-books and Amazon's potential role in that future at an upcoming meeting or publisher CEOs. Later that month, at a dinner meeting hosted by Penguin Group CEO John Makinson, again in "The Chef's Wine Cellar" at Picholene, the same group of publisher CEOs met once more.

35.     On or about June 16, 2009, Mr. Makinson again met privately with other Publisher Defendant CEOs and discussed, *inter alia*, the growth of e-books and Amazon's role in that growth

36.     On or about September 10, 2009, Mr. Makinson once again met privately with other Publisher Defendant CEOs and the CEO of one non-defendant publisher in a private room of a different Manhattan restaurant, Alto. They discussed the growth of e-books and complained about Amazon's role in that growth.

37.     In addition to the CEO dinner meetings, Publisher Defendants' CEOs and other executives met in-person, one-on-one to communicate about e-books multiple times over the course of 2009 and into 2010. Similar meetings took place in Europe, including meetings in the fall of 2009 between executives of Macmillan parent company Verlagsgruppe Georg von

Holtzbrinck GmbH and executives of another Publisher Defendant's parent company.

Macmillan CEO John Sargent joined at least one of these parent company meetings

38.    These private meetings provided the Publisher Defendants' CEOs the opportunity
to discuss how they collectively could solve "the $9.99 problem."

### 2.    Publisher Defendants Conspire to Raise E-book Prices Under the Guise of Joint Venture Discussions

39.    While each Publisher Defendant recognized that it could not solve "the $9.99
problem" by itself, collectively the Publisher Defendants accounted for nearly half of Amazon's
e-book revenues, and by refusing to compete with one another for Amazon's business, the
Publisher Defendants could force Amazon to accept the Publisher Defendants' new contract
terms and to change its pricing practices.

40.    The Publisher Defendants thus conspired to act collectively, initially in the guise
of joint ventures. These ostensible joint ventures were not meant to enhance competition by
bringing to market products or services that the publishers could not offer unilaterally, but rather
were designed as anticompetitive measures to raise prices.

41.    All five Publisher Defendants agreed in 2009 at the latest to act collectively to
raise retail prices for the most popular e-books above $9.99. One CEO of a Publisher
Defendant's parent company explained to his corporate superior in a July 29, 2009 e-mail
message that "[i]n the USA and the UK, but also in Spain and France to a lesser degree, the 'top
publishers' are in discussions to create an alternative platform to Amazon for e-books. The goal
is less to compete with Amazon as to force it to accept a price level higher than 9.99. . . . I am in
NY this week to promote these ideas and the movement is positive with [the other four Publisher
Defendants]." (Translated from French).

12

42.    Less than a week later, in an August 4, 2009 strategy memo for the board of
directors of Penguin's ultimate parent company, Penguin Group CEO John Makinson conveyed
the same message:

> Competition for the attention of readers will be most intense from
> digital companies whose objective may be to disintermediate
> traditional publishers altogether. This is not a new threat but we
> do appear to be on a collision course with Amazon, and possibly
> Google as well. It will not be possible for any individual publisher
> to mount an effective response, because of both the resources
> necessary and the risk of retribution, so the industry needs to
> develop a common strategy. This is the context for the
> development of the Project Z initiatives [joint ventures] in London
> and New York.

### 3.    Defendants Agree To Increase and Stabilize Retail E-book Prices by Collectively Adopting an Agency Model

43.    To raise e-book prices, the Publisher Defendants also began to consider in late
2009 selling e-books under an "agency model" that would take away Amazon's ability to set low
retail prices. As one CEO of a Publisher Defendant's parent company explained in a
December 6, 2009 e-mail message, "[o]ur goal is to force Amazon to return to acceptable sales
prices through the establishment of agency contracts in the USA. . . . To succeed our colleagues
must know that we entered the fray and follow us." (Translated from French).

44.    Apple's entry into the e-book business provided a perfect opportunity for
collective action to implement the agency model and use it to raise retail e-book prices. Apple
initially contemplated selling e-books through the existing wholesale model, which was similar
to the manner in which Apple sold the vast majority of the digital media it offered in its iTunes
store. On February 19, 2009, Apple Vice President of Internet Services Eddy Cue explained to
Apple CEO Steve Jobs in an e-mail, "[a]t this point, it would be very easy for us to compete and
I think trounce Amazon by opening up our own ebook store." In addition to considering
competitive entry at that time, though, Apple also contemplated illegally dividing the digital

13

content world with Amazon, allowing each to "own the category" of its choice—audio/video to Apple and e-books to Amazon.

45.     Apple soon concluded, though, that competition from other retailers—especially Amazon—would prevent Apple from earning its desired 30 percent margins on e-book sales. Ultimately, Apple, together with the Publisher Defendants, set in Motion a plan that would compel all non-Apple e-book retailers also to sign onto agency or else, as Apple's CEO put it, the Publisher Defendants all would say, "we're not going to give you the books."

46.     The executive in charge of Apple's inchoate e-books business, Eddy Cue, telephoned each Publisher Defendant and Random House on or around December 8, 2009 to schedule exploratory meetings in New York City on December 15 and December 16. Hachette and HarperCollins took the lead in working with Apple to capitalize on this golden opportunity for the Publisher Defendants to achieve their goal of raising and stabilizing retail e-book prices above $9.99 by collectively imposing the agency model on the industry.

47.     It appears that Hachette and HarperCollins communicated with each other about moving to an agency model during the brief window between Mr. Cue's first telephone calls to the Publisher Defendants and his visit to meet with their CEOs. On the morning of December 10, 2009, a HarperCollins executive added to his calendar an appointment to call a Hachette executive at 10:50 AM. At 11:01 AM, the Hachette executive returned the phone call, and the two spoke for six minutes. Then, less than a week later in New York, both Hachette and HarperCollins executives told Mr. Cue in their initial meetings with him that they wanted to sell e-books under an agency model, a dramatic departure from the way books had been sold for over a century.

14

48.     The other Publisher Defendants also made clear to Apple that they "certainly" did not want to continue "the existing way that they were doing business," *i.e.,* with Amazon promoting their most popular e-books for $9.99 under a wholesale model.

49.     Apple saw a way to turn the agency scheme into a highly profitable model for itself. Apple determined to give the Publisher Defendants what they wanted while shielding itself from retail price competition and realizing margins far in excess of what e-book retailers then averaged on each newly released or bestselling e-book sold. Apple realized that, as a result of the scheme, "the customer" would "pay[] a little more."

50.     On December 16, 2009, the day after both companies' initial meetings with Apple, Penguin Group CEO John Makinson had a breakfast meeting at a London hotel with the CEO of another Publisher Defendant's parent company. Consistent with the Publisher Defendants' other efforts to conceal their activities, Mr. Makinson's breakfast companion wrote to his U.S. subordinate that he would recount portions of his discussion with Mr. Makinson only by telephone.

51.     By the time Apple arrived for a second round of meetings during the week of December 21, 2009, the agency model had become the focus of its discussions with all of the Publisher Defendants. In these discussions, Apple proposed that the Publisher Defendants require *all* retailers of their e-books to accept the agency model. Apple thereby sought to ensure that it would not have to compete on retail prices. The proposal appealed to the Publisher Defendants because wresting pricing control from Amazon and other e-book retailers would advance their collusive plan to raise retail e-book prices

52.     The Publisher Defendants acknowledged to Apple their common objective to end Amazon's $9.99 pricing. As Mr. Cue reported in an e-mail message to Apple's CEO Steve Jobs,

15

the three publishers with whom he had met saw the "plus" of Apple's position as "solv[ing the] Amazon problem." The "negative" was that Apple's proposed retail prices—topping out at $12.99 for newly released and bestselling e-books—were a "little less than [the publishers] would like." Likewise, Mr. Jobs later informed an executive of one of the Publisher Defendant's corporate parents that "[a]ll major publishers" had told Apple that "Amazon's $9.99 price for new releases is eroding the value perception of their products in customer's minds, and they do not want this practice to continue for new releases."

53.    As perhaps the only company that could facilitate their goal of raising retail e-book prices across the industry, Apple knew that it had significant leverage in negotiations with Publisher Defendants. Apple exercised this leverage to demand a thirty percent commission—a margin significantly above the prevailing competitive margins for e-book retailers. The Publisher Defendants worried that the combination of paying Apple a higher commission than they would have liked and pricing their e-books lower than they wanted might be too much to bear in exchange for Apple's facilitation of their agreement to raise retail e-book prices. Ultimately, though, they convinced Apple to allow them to raise prices high enough to make the deal palatable to them.

54.    As it negotiated with the Publishers Defendants in December 2009 and January 2010, Apple kept each Publisher Defendant informed of the status of its negotiations with the other Publisher Defendants. Apple also assured the Publisher Defendants that its proposals were the same to each and that no deal Apple agreed to with one publisher would be materially different from any deal it agreed to with another publisher. Apple thus knowingly served as a critical conspiracy participant by allowing the Publisher Defendants to signal to one another both (a) which agency terms would comprise an acceptable means of achieving their ultimate goal of

16

raising and stabilizing retail e-book prices, and (b) that they could lock themselves into this particular means of collectively achieving that goal by all signing their Apple Agency Agreement.

55.    Apple's Mr. Cue e-mailed each Publisher Defendant between January 4, 2010, and January 6, 2010 an outline of what he tabbed "the best approach for e-books." He reassured Penguin USA CEO David Shanks and other Publisher Defendant CEOs that Apple adopted the approach "[a]fter talking to all the other publishers." Mr. Cue sent substantively identical e-mail messages and proposals to each Publisher Defendant.

56.    The outlined proposal that Apple circulated after consulting with each Publisher Defendant contained several key features. First, as Hachette and HarperCollins had initially suggested to Apple, the publisher would be the principal and Apple would be the agent for e-book sales. Consumer pricing authority would be transferred from retailers to publishers. Second, Apple's proposal mandated that every other retailer of each publisher's e-books— Apple's direct competitors—be forced to accept the agency model as well. As Mr. Cue wrote, "all resellers of new titles need to be in agency model." Third, Apple would receive a 30 percent commission for each e-book sale. And fourth, each Publisher Defendant would have identical pricing tiers for e-books sold through Apple's iBookstore.

57.    On January 11, 2010, Apple e-mailed its proposed e-book distribution agreement to all Publisher Defendants. As with the outlined proposals Apple sent earlier in January, the proposed e-book distribution agreements were substantially the same. Also on January 11, 2010, Apple separately e-mailed to Penguin and two other Publisher Defendants charts showing how the Publisher Defendant's bestselling e-books would be priced at $12.99—the ostensibly maximum price under Apple's then-current price tier proposal—in the iBookstore.

17

58.    The proposed e-book distribution agreement mainly incorporated the principles

Apple set out in its e-mail messages of January 4 through January 6, with two notable changes.

First, Apple demanded that the Publisher Defendants provide Apple their complete e-book

catalogs and that they not delay the electronic release of any title behind its print release.

Second, and more important, Apple replaced the express requirement that each publisher adopt

the agency model with each of its retailers with an unusual most favored nation ("MFN") pricing

provision.  That provision was not structured like a standard MFN in favor of a retailer, ensuring

Apple that it would receive the best available wholesale price.  Nor did the MFN ensure Apple

the Publisher Defendants would not set a higher retail price on the iBookstore than they set on

other websites where they controlled retail prices.  Instead, the MFN here required each

publisher to guarantee that it would lower the retail price of each e-book in Apple's iBookstore

to match the lowest price offered by any other retailer, even if the Publisher Defendant did not

control that other retailer's ultimate consumer price.  That is, instead of an MFN designed to

protect Apple's ability to compete, this MFN was designed to protect Apple from having to

compete on price at all, while still maintaining Apple's 30 percent margin.

59.    The purpose of these provisions was to work in concert to enforce the

Defendants' agreement to raise and stabilize retail e-book prices.  Apple and the Publisher

Defendants recognized that coupling Apple's right to all of their e-books with its right to demand

that those e-books not be priced higher on the iBookstore than on any other website effectively

required that each Publisher Defendant take away retail pricing control from all other e-book

retailers, including stripping them of any ability to discount or otherwise price promote e-books

out of the retailer's own margins.  Otherwise, the retail price MFN would cause Apple's

iBookstore prices to drop to match the best available retail price of each e-book, and the

18

Publisher Defendants would receive only 70 percent of those reduced retail prices. Price competition by other retailers, if allowed to continue, thus likely would reduce e-book revenues to levels the Publisher Defendants could not control or predict.

60.    In negotiating the retail price MFN with Apple, "some of [the Publisher Defendants]" asserted that Apple did not need the provision "because they would be moving to an agency model with [the other e-book retailers,]" regardless. Ultimately, though, all Defendants agreed to include the MFN commitment mechanism.

61.    On January 16, 2010, Apple, via Mr. Cue, offered revised terms to the Publisher Defendants that again were identical in substance. Apple modified its earlier proposal in two significant ways. First, in response to publisher requests, it added new maximum pricing tiers that increased permissible e-book prices to $16.99 or $19.99, depending on the books' hardcover list price. Second, Apple's new proposal mitigated these price increases somewhat by adding special pricing tiers for e-book versions of books on the *New York Times* fiction and non-fiction bestseller lists. For e-book versions of bestsellers bearing list prices of $30 or less, Publisher Defendants could set a price up to $12.99; for bestsellers bearing list prices between $30 and $35, the e-book price cap would be $14.99. In conjunction with the revised proposal, Mr. Cue set up meetings for the next week to finalize agreements with the Publisher Defendants.

62.    Each Publisher Defendant required assurances that it would not be the only publisher to sign an agreement with Apple that would compel it either to take pricing authority from Amazon or to pull its e-books from Amazon. The Publisher Defendants continued to fear that Amazon would act to protect its ability to price e-books at $9.99 or less if any one of them acted alone. Individual Publisher Defendants also feared punishment in the marketplace if only its e-books suddenly became more expensive at retail while other publishers continued to allow

retailers to compete on price. As Mr. Cue noted, "all of them were very concerned about being the only ones to sign a deal with us." Penguin explicitly communicated to Apple that it would sign an e-book distribution agreement with Apple only if at least three of the other "major[]" publishers did as well. Apple supplied the needed assurances.

63.    While the Publisher Defendants were discussing e-book distribution terms with Apple during the week of January 18, 2010, Amazon met in New York City with a number of prominent authors and agents to unveil a new program under which copyright holders could take their e-books directly to Amazon—cutting out the publisher—and Amazon would pay royalties of up to 70 percent, far in excess of what publishers offered. This announcement further highlighted the direct competitive threat Amazon posed to the Publisher Defendants' business model. The Publisher Defendants reacted immediately. For example, Penguin USA CEO David reported being "really angry" after hav[ing] read [Amazon's] announcement." After thinking about it for a day, Mr. Shanks concluded, "[o]n Apple I am now more convinced that we need a viable alternative to Amazon or this nonsense will continue and get much worse." Another decisionmaker stated he was "p****d" at Amazon for starting to compete directly against the publishers and expressed his desire "to screw Amazon."

64.    To persuade one of the Publisher Defendants to stay with the others and sign an agreement, Apple CEO Steve Jobs wrote to an executive of the Publisher Defendant's corporate parent that the publisher had only two choices apart from signing the Apple Agency Agreement: (i) accept the status quo ("Keep going with Amazon at $9.99"); or (ii) continue with a losing policy of delaying the release of electronic versions of new titles ("Hold back your books from Amazon"). According to Jobs, the Apple deal offered the Publisher Defendants a superior

20

alternative path to the higher retail e-book prices they sought: "Throw in with Apple and see if we can all make a go of this to create a real mainstream e-books market at $12.99 and $14.99."

65.     In addition to passing information through Apple and during their private dinners and other in-person meetings, the Publisher Defendants frequently communicated by telephone to exchange assurances of common action in attempting to raise the retail price of e-books. These telephone communications increased significantly during the two-month period in which the Publisher Defendants considered and entered the Apple Agency Agreements. During December 2009 and January 2010, the Publisher Defendants' U.S. CEOs placed at least 56 phone calls to one another. Each CEO, including Penguin's Shanks and Macmillan's Sargent, placed at least seven such phone calls.

66.     The timing, frequency, duration, and content of the Publisher Defendant CEOs' phone calls demonstrate that the Publisher Defendants used them to seek and exchange assurances of common strategies and business plans regarding the Apple Agency Agreements. For example, in addition to the telephone calls already described in this complaint:

- Near the time Apple first presented the agency model, one Publisher Defendant's CEO used a telephone call—ostensibly made to discuss a marketing joint venture—to tell Penguin USA CEO David Shanks that "everyone is in the same place with Apple."

- After receiving Apple's January 16, 2010 revised proposal, executives of several Publisher Defendants responded to the revised proposal and meetings by, again, seeking and exchanging confidential information. For example, on Sunday, January 17, one Publisher Defendant's CEO used his mobile phone to call another Publisher Defendant's CEO and talk for approximately ten minutes. And on the morning of January 19, Penguin USA CEO David Shanks had an extended telephone conversation with the CEO of another Publisher Defendant.

- On January 21, 2010, the CEO of one Publisher Defendant's parent company instructed his U.S. subordinate via e-mail to find out Apple's progress in agency negotiations with other publishers. Four minutes after that e-mail was sent, the U.S. executive called another Publisher Defendant's CEO, and the two spoke for over eleven minutes.

21

- On January 22, 2010, at 9:30 a.m., Apple's Cue met with one Publisher Defendant's CEO to make what Cue hoped would be a "final go/no-go decision" about whether the Publisher Defendant would sign an agreement with Apple.  Less than an hour later, the Publisher Defendant's CEO made phone calls, two minutes apart, to two other Publisher Defendants' CEOs, including Macmillan's Sargent.  The CEO who placed the calls admitted under oath to placing them specifically to learn if the other two Publisher Defendants would sign with Apple prior to Apple's iPad launch.

- On the evening of Saturday, January 23, 2010, Apple's Cue e-mailed his boss, Steve Jobs, and noted that Penguin USA David Shanks "want[ed] an assurance that he is 1 of 4 before signing."  The following Monday morning, at 9:46 a.m., Mr. Shanks called another Publisher Defendant's CEO and the two talked for approximately four minutes.  Both Penguin and the other Publisher Defendant signed their Apple Agency Agreements later that day.

67.    On January 24, 2010, Hachette signed an e-book distribution agreement with Apple.  Over the next two days, Simon & Schuster, Macmillan, Penguin, and HarperCollins all followed suit and signed e-book distribution agreements with Apple.  Within these three days, the Publisher Defendants agreed with Apple to abandon the longstanding wholesale model for selling e-books.  The Apple Agency Agreements took effect simultaneously on April 3, 2010 with the release of Apple's new iPad.

68.    The final version of the pricing tiers in the Apple Agency Agreements contained the $12.99 and $14.99 price points for bestsellers, discussed earlier, and also established prices for all other newly released titles based on the hardcover list price of the same title.  Although couched as maximum retail prices, the price tiers in fact established the retail e-book prices to be charged by Publisher Defendants.

69.    By entering the Apple Agency Agreements, each Publisher Defendant effectively agreed to require all of their e-book retailers to accept the agency model.  Both Apple and the Publisher Defendants understood the Agreements would compel the Publisher Defendants to take pricing authority from all non-Apple e-book retailers.  A February 10, 2010 presentation by

one Publisher Defendant applauded this result (emphasis in original): "The Apple agency model deal means that we will have to **shift to an agency model with Amazon which [will] strengthen our control over pricing.**"

70.    Apple understood that the final Apple Agency Agreements ensured that the Publisher Defendants would raise their retail e-book prices to the ostensible limits set by the Apple price tiers not only in Apple's forthcoming iBookstore, but on Amazon.com and all other consumer sites as well. When asked by a *Wall Street Journal* reporter at the January 27, 2010 iPad unveiling event, "Why should she buy a book for . . . $14.99 from your device when she could buy one for $9.99 from Amazon on the Kindle or from Barnes & Noble on the Nook?" Apple CEO Steve Jobs responded, "that won't be the case . . . . the prices will be the same."

71.    Apple understood that the retail price MFN was the key commitment mechanism to keep the Publisher Defendants advancing their conspiracy in lockstep. Regarding the effect of the MFN, Apple executive Pete Alcorn remarked in the context of the European roll-out of the agency model in the spring of 2010:

> I told [Apple executive Keith Moerer] that I think he and Eddy
> [Cue] made it at least halfway to changing the industry
> permanently, and we should keep the pads on and keep fighting for
> it. I might regret that later, but right now I feel like it's a giant win
> to keep pushing the MFN and forcing people off the [A]mazon
> model and onto ours. If anything, the place to give is the pricing –
> long run, the mfn is more important. The interesting insight in the
> meeting was Eddy's explanation that it doesn't have to be that
> broad – any decent MFN forces the model

72.    Within the four months following the signing of the Apple Agency Agreements, and over Amazon's objection, each Publisher Defendant had transformed its business relationship with all of the major e-book retailers from a wholesale model to an agency model and imposed flat prohibition against e-book discounting or other price competition on all non-Apple e-book retailers.

73.    For example, after it signed its Apple Agency Agreement, Macmillan presented Amazon a choice: adopt the agency model or lose the ability to sell e-book versions of new hardcover titles for the first seven months of their release. Amazon rejected Macmillan's ultimatum and sought to preserve its ability to sell e-book versions of newly released hardcover titles for $9.99. To resist Macmillan's efforts to force it to accept either the agency model or delayed electronic availability, Amazon effectively stopped selling Macmillan's print books and e-books.

74.    When Amazon stopped selling Macmillan titles, other Publisher Defendants did not view the situation as an opportunity to gain market share from a weakened competitor. Instead, they rallied to support Macmillan. For example, the CEO of one Publisher Defendant's parent company instructed the Publisher Defendant's CEO that "[Macmillan CEO] John Sargent needs our help!" The parent company CEO explained, "M[acm]illan have been brave, but they are small. We need to move the lines. And I am thrilled to know how A[mazon] will react against 3 or 4 of the big guys."

75.    The CEO of one Publisher Defendant's parent company assured Macmillan CEO John Sargent of his company's support in a January 31, 2010 email: "I can ensure you that you are not going to find your company alone in the battle." The same parent company CEO also assured the head of Macmillan's corporate parent in a February 1 email that "others will enter the battle field!" Overall, Macmillan received "hugely supportive" correspondence from the publishing industry during Macmillan's effort to force Amazon to accept the agency model.

76.    As its battle with Amazon continued, Macmillan knew that, because the other Publisher Defendant, via the Apple Agency Agreements, had locked themselves into forcing agency on Amazon to advance their conspiratorial goals, Amazon soon would face similar edicts

from a united front of Publisher Defendants. And Amazon could not delist the books of all five

Publisher Defendants because they together accounted for nearly half of Amazon's e-book

business. Macmillan CEO John Sargent explained the company's reasoning: "we believed

whatever was happening, whatever Amazon was doing here, they were going to face – they're

going to have more of the same in the future one way or another." Another Publisher Defendant

similarly recognized that Macmillan was not acting unilaterally but rather was "leading the

charge on moving Amazon to the agency model."

77.    Amazon quickly came to fully appreciate that not just Macmillan but all five

Publisher Defendants had irrevocably committed themselves to the agency model across all

retailers, including taking control of retail pricing and thereby stripping away any opportunity for

e-book retailers to compete on price. Just two days after it stopped selling Macmillan titles,

Amazon capitulated and publicly announced that it had no choice but to accept the agency

model, and it soon resumed selling Macmillan's e-books and print book titles.

### 4.    Defendants Further the Conspiracy by Pressuring Another Publisher To Adopt the Agency Model

78.    When a company takes a pro-competitive action by introducing a new product,

lowering its prices, or even adopting a new business model that helps it sell more product at

better prices, it typically does not want its competitors to copy its action, but prefers to maintain

a first-mover or competitive advantage. In contrast, when companies jointly take collusive

action, such as instituting a coordinated price increase, they typically want the rest of their

competitors to join them in that action. Because collusive actions are not pro-competitive or

consumer friendly, any competitor that does not go along with the conspirators can take more

consumer friendly actions and see its market share rise at the expense of the conspirators. Here,

the Defendants acted consistently with a collusive arrangement, and inconsistently with a pro-

competitive arrangement, as they sought to pressure another publisher (whose market share was growing at the Publisher Defendants' expense after the Apple Agency Contracts became effective) to join them.

79.    Penguin appears to have taken the lead in these efforts. Its U.S. CEO, David Shanks, twice directly told the executives of the holdout major publisher about his displeasure with their decision to continue selling e-books on the wholesale model. Mr. Shanks tried to justify the actions of the conspiracy as an effort to save brick-and-mortar bookstores and criticized the other publishers for "not helping" the group. The executives of the other publisher responded to Mr. Shanks's complaints by explaining their objections to the agency model.

80.    Mr. Shanks also encouraged a large print book and e-book retailer to punish the other publishers for not joining Defendants' conspiracy. In March 2010, Mr. Shanks sent an e-mail message to an executive of the retailer complaining that the publisher "has chosen to stay on their current model and will allow retailers to sell at whatever price they wish." Mr. Shanks argued that "[s]ince Penguin is looking out for [your] welfare at what appears to be great costs to us, I would hope that [you] would be equally brutal to Publishers who have thrown in with your competition with obvious disdain for your welfare. . . . I hope you make [the publisher] hurt like Amazon is doing to [the Publisher Defendants]."

81.    When the third-party retailer continued to promote the non-defendant publisher's books, Mr. Shanks applied more pressure. In a June 22, 2010 email to the retailer's CEO, Mr. Shanks claimed to be "baffled" as to why the retailer would promote that publisher's books instead of just those published by "people who stood up for you."

82.    Throughout the summer of 2010, Apple also cajoled the holdout publisher to adopt agency terms in line with those of the Publisher Defendants, including on a phone call

between Apple CEO Steve Jobs and the holdout publisher's CEO. Apple flatly refused to sell the holdout publisher's e-books unless and until it agreed to an agency relationship substantially similar to the arrangement between Apple and the Publisher Defendants defined by Apple Agency Agreements.

### 5.    Conspiracy Succeeds at Raising and Stabilizing Consumer E-book Prices

83.    The ostensible maximum prices included in the Apple Agency Agreements' price schedule represent, in practice, actual e-book prices. Indeed, at the time the Publisher Defendants snatched retail pricing authority away from Amazon and other e-book retailers, not one of them had built an internal retail pricing apparatus sufficient to do anything other than set retail prices at the Apple Agency Agreements' ostensible caps. Once their agency agreements took effect, the Publisher Defendants raised e-book prices at all retail outlets to the maximum price level within each tier. Prior to the Publisher Defendants entering into settlement agreements, for two years they continued setting e-book retail prices according to the Apple price tiers and set the retail prices for the electronic versions of all or nearly all of their bestselling hardcover titles at the ostensible maximum price allowed by those price tiers.

84.    The Publisher Defendants' collective adoption of the Apple Agency Agreements allowed them (facilitated by Apple) to raise, fix, and stabilize retail e-book prices in three steps: (a) they took away retail pricing authority from retailers; (b) they then set retail e-book prices according to the Apple price tiers; and (c) they then exported the agency model and higher retail prices to the rest of the industry, in part to comply with the retail price MFN included in each Apple Agency Agreement.

85.    Defendants' conspiracy and agreement to raise and stabilize retail e-book prices by collectively adopting the agency model and Apple price tiers led to an increase in the retail

prices of newly released and bestselling e-books. Prior to the Defendants' conspiracy, consumers benefitted from price competition that led to $9.99 prices for newly released and bestselling e-books. Almost immediately after Apple launched its iBookstore in April 2010 and the Publisher Defendants imposed agency model pricing on all retailers, the Publisher Defendants' e-book prices for the most newly released and bestselling e-books rose to either $12.99 or $14.99.

86.     Defendants' conspiracy and agreement to raise and stabilize retail e-book prices by collectively adopting the agency model and Apple price tiers for their newly released and bestselling e-books also led to an increase in average retail prices of the balance of Publisher Defendants' e-book catalogs, their so-called "backlists." Now that the Publisher Defendants control the retail prices of e-books—but Amazon maintains control of its print book retail prices—Publisher Defendants' e-book prices sometimes are higher than Amazon's prices for print versions of the same titles.

## II.    DNAML IS CRIPPLED BY DEFENDANTS' PRICE-FIXING CONSPIRACY

### A.    DNAML's Business

87.     DNAML has been involved in the e-book industry for over a decade—primarily as a software developer. Prior to attempting to enter the retail market for e-books, it offered software tools for authors to produce and manage e-books and provided websites that distributed industry news, provided educational components, and promoted the benefits of e-books. Recognizing that the e-book retail market was poised to grow, DNAML spent several years preparing for its entry into the market by: arranging contracts with the Publisher Defendants; acquiring industry-defining domain names eBook.com and eBook.biz; and developing and establishing an e-book store, a distribution platform, a digital rights management (DRM) solution, a payment platform, a reseller platform, promotional tools, and authoring tools. In fact,

28

DNAML developed one of the first authoring and DRM technologies for e-books and was actively distributing this software long before book publishers even embraced the e-book market.

88.    Once it entered the market, and prior to the commencement of Defendants' conspiracy, DNAML successfully begun selling e-books on its various websites such as www.eBook.com and www.sharewareebooks.com. DNAML did not have a dedicated e-reader or tablet device unlike Amazon or Barnes & Noble. Instead, consumers could purchase an e-book from DNAML's website and download the e-book to one or more devices for reading. As discussed below, before it became impractical, DNAML had almost completed the process of developing its own App for storing and reading e-books to be used on other devices.

89.    DNAML's e-book business model was predicated on aggressive price competition, much like Amazon's was. DNAML built its retail software marketing tools based around discounts and discounted bundling. DNAML test marketed with discounts of over 80 percent. DNAML offered popular titles during its "Happy Hour" promotions at steep discounts. For example, for one hour DNAML offered the title, *The Accidental Billionaires* by Ben Mezrich for $5.00. The digital list price of this book was $25.00. Similarly, during another "Happy Hour" promotion, DNAML offered the title *I, Alex Cross* by James Patterson for $5.00. This book had a digital list price of $27.99. These discounts would be used to capture customers and retain customer loyalty. Additionally, DNAML offered regular discounts of over 20 percent to incentivize consumers to continue purchasing from the DNAML retail platform.

90.    DNAML offered unique retail features that the main large retailers did not. For example, DNAML sold e-books in bundles that would save consumers money by purchasing multiple books at once. Moreover, DNAML offered other bundles where e-books would be

given away for free with the purchase of other digital products. DNAML also regularly offered

discount coupons for its website members and new customers.

91.    DNAML expected to grow rapidly. It was formed in the nascent period of the e-

book industry when competition was vibrant and businesses had not yet become so entrenched

that market entry was effectively futile. Furthermore, DNAML had extremely recognizable

domain names that brought it considerable internet traffic—particularly www.eBook.com.

92.    DNAML's primary e-book suppliers were Hachette and HarperCollins. DNAML

converted the Publisher Defendants' e-books to its own proprietary format that contained the

requisite DRM. Before the Publisher Defendants forced the agency agreements on DNAML,

DNAML had converted thousands of titles to e-books.

**B.    Defendants Force Agency Agreements On DNAML Precluding It From Competing In The Market**

93.    Shortly after Defendants reached their price-fixing agreement in early 2010, the

Publisher Defendants approached DNAML and demanded that they agree to the agency

agreements. Although DNAML did not want to agree to the agency agreements, it had virtually

no choice but to sign them or the Publisher Defendants would no longer permit DNAML to sell

their e-books; even Amazon, with its considerable market power, could not sway the Publisher

Defendants. Even if DNAML could have somehow convinced one of the Publisher Defendants

to allow it to drop below the tiered prices that Defendants set, the series of MFN clauses would

still have insulated Apple from price competition. Accordingly, just as Amazon was forced to

raise prices as a result of Defendants' price-fixing agreement, DNAML was forced to stop

discounting its prices and cease using its already developed discount-driven promotional tools.

This was the coup de grace to DNAML's business.

94.    Unlike Amazon or Barnes & Noble, DNAML did not have international brand recognition. The primary incentive to purchase an e-book from DNAML over Amazon, Apple, or Barnes & Noble was DNAML's favorable pricing. When Defendants eliminated DNAML's ability to offer consumers more favorable prices, DNAML's ability to compete was crippled. As was already proven by the DOJ, the effect of Defendants' agreement was to not only deprive consumers of favorable e-book pricing but to also preclude retailers from establishing a foothold in the market through competition based on price and innovation.

95.    Lastly, DNAML was also in the final stages of developing an App—the DNL Reader version 2—that would allow consumers to purchase and read e-books on an iPad, iPhones, or other tablet devices. But in an effort to eradicate retail competition and price transparency, in 2011, Apple specifically modified its policy to prohibit other e-book sellers from linking to their websites to allow consumers to purchase e-books. So, if an e-book seller wanted to sell an e-book through its App, it had to pay Apple a 30 percent fee *on top* of what it was already paying the Publisher. Of course, the practical effect of such a policy was to make the iBookstore the only practical App to purchase books from (or send consumers through hoops to get e-books on another App). Other nascent competitors, such as iFlow, who had a fully developed App, were foreclosed from selling as soon as Apple implemented its new policy. Upon seeing the fate of iFlow and others, and knowing it could no longer offer competitive prices, DNAML ceased production of its DNL Reader 2 App for iPads and iPhones, knowing it would be pointless to complete.

96.    As a direct result of Defendants' price fixing and Apple's effective prohibition of entry to the iPad and iPhone platform, DNAML's investors lost all confidence in the market's ability to allow for any opportunity for retail growth. Accordingly, DNAML was forced to cease

its efforts to establish an e-book retail presence through its industry-defining domain name—

eBook.com. With no reasonable alternative, DNAML offered its domain name for sale in 2010.

The domain name sold in 2012, effectively ending DNAML's years of preparation to enter the e-

book retail market.

 97. In sum, Defendants' industry-wide price-fixing agreement forced DNAML in line

with everyone else. It became unable to distinguish itself through offering attractive prices,

offering innovative means to purchase e-books through bundles or loyalty rewards, or offering

attractive cross-platform support. Without the ability to distinguish itself in any meaningful way,

DNAML had no chance of competing with several large international conglomerates offering the

same items at the same prices that were prescribed by an industry-wide conspiracy.

**CLAIM FOR RELIEF**

**COUNT ONE**

**(Against All Defendants for Violations of 15 U.S.C. § 1)**

 98. Beginning no later than 2009, and continuing to at least late 2012 when a few of

the Publisher Defendants settled with the DOJ, Defendants and their co-conspirators have

combined and conspired to unreasonably restrain interstate trade and commerce, constituting a

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

 99. Defendants conspired and agreed to raise, fix, and stabilize retail e-book prices in

order to end price competition among e-book retailers and to limit retail price competition among

the Publisher Defendants. Defendants accomplished this by collectively agreeing to adopt and

adhere to functionally identical methods of selling e-books and by setting price schedules.

 100. In reaching their unlawful agreement in restraint of trade, some or all of the

Defendants:

32

     a.     Shared their business information, plans, and strategies in order to formulate ways to raise retail e-book prices;

     b.     Assured each other of support in attempting to raise retail e-book prices;

     c.     Employed ostensible joint venture meetings to disguise their attempts to raise retail e-book prices;

     d.     Fixed the method of and formulas for setting retail e-book prices;

     e.     Fixed tiers for retail e-book prices;

     f.     Eliminated the ability of e-book retailers to fund retail e-book price decreases out of their own margins; and

     g.     Raised the retail prices of their newly released and bestselling e-books to the agreed prices – the ostensible price caps – contained in the pricing schedule of their Apple Agency Agreements.

101.    Defendants' agreement and conspiracy constitutes a per se violation of Section 1 of the Sherman Act because it is an anticompetitive agreement to raise, fix, and stabilize prices in the e-book industry. The agreement or conspiracy was meant to eliminate price competition among e-book retailers, including DNAML.

102.    Defendants' agreement and conspiracy has resulted in anticompetitive effects on consumers in the e-books market by depriving consumers of the benefits of price competition and innovation among e-book retailers such as DNAML. Because of Defendants' unlawful restraint of trade, DNAML is no longer able to offer, and consumers are no longer able to purchase e-books at discounted prices that DNAML and others could offer. Moreover, retail innovation has also been suppressed. For example, the price-fixing agreement precludes retailers from offering e-books in bundles or having deeply discounted "Happy Hour" specials as

DNAML was offering. Defendants' agreement or conspiracy constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

103.    Where, as here, Defendants have engaged in a per se violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required. To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is trade e-books. The anticompetitive acts at issue in this case directly affect the sale of trade e-books to consumers. No reasonable substitute exists for e-books. There are no technological alternatives to e-books, thousands of which can be stored on a single small device. E-books can be stored and read on electronic devices, while print books cannot. E-books can be located, purchased, and downloaded anywhere a customer has an internet connection, while print books cannot. Industry firms also view e-books as a separate market segment from print books, and the Publisher Defendants were able to impose and sustain a significant retail price increase for their trade e-books.

104.    The relevant geographic market is the United States. The rights to license e-books are granted on territorial bases, with the United States typically forming its own territory. E-book retailers typically present a unique storefront to U.S. consumers, often with e-books bearing different retail prices than the same titles would command on the same retailer's foreign websites.

105.    The Publisher Defendants possess market power in the market for trade e-books. The Publisher Defendants successfully imposed and sustained a significant retail price increase for their trade e-books. Collectively, they create and distribute a wide variety of popular e-books, regularly comprising over half of the *New York Times* fiction and non-fiction bestseller lists. Collectively, they provide a critical input to any firm selling trade e-books to consumers.

Any retailer selling trade e-books to consumers would not be able to forgo profitably the sale of the Publisher Defendants' e-books.

106.    Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

        a.     Increasing the retail prices of trade e-books;

        b.     Eliminating competition on price among e-book retailers;

        c.     Restraining competition on retail price among the Publisher Defendants;

        d.     Restraining competition among the Publisher Defendants for favorable relationships with e-book retailers;

        e.     Constraining innovation among e-book retailers;

        f.     Entrenching incumbent publishers' favorable position in the sale and distribution of print books by slowing the migration from print books to e-books;

        g.     Making more likely express or tacit collusion among publishers; and

        h.     Reducing competitive pressure on print book prices.

107.    Defendants' agreement and conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

108.    DNAML, as well as consumers, have suffered antitrust injury from Defendants' conduct.  Competition was diminished because independent retailers were no longer able to compete with large international conglomerates by offering attractive prices or unique retail innovations.  Because each of the Publisher Defendants forced a functionally identical agency agreement on DNAML both interbrand and intrabrand competition were reduced or eliminated.

Because of this demonstrable harm to competition, DNAML was crippled and effectively put out of business.

109.    DNAML's injury flows directly from Defendants' anticompetitive agreement in the market for e-books because it precluded DNAML from being able to compete by offering lower prices or retail innovations to consumers. Without the incentive of lower prices or retail innovations, DNAML lacked the goodwill and recognition to expand in the market.

110.    Because this case is based in material part on matters complained of in *United States of America v. Apple, Inc.*, Case No. 12-CV-2826 in the United States District Court for the Southern District of New York, filed on April 11, 2012, the running of the statute of limitations has been suspended since that filing date by reason of Section 5(b) of the Clayton Act (15 U.S.C. 16(b)).

111.    The trial judgment in the aforementioned case, which was entered on September 5, 2013, constitutes prima facie evidence that Apple violated the antitrust laws in the ways and means described by Judge Cote's Opinion of July 10, 2013.

## PRAYER FOR RELIEF

WHEREFORE, DNAML PTY, LIMITED, prays for relief against Defendants, and each of them, that the Court find that:

(a)    Defendants violated Section 1 of the Sherman Act by engaging in conduct including, but not limited to, raising, fixing, and stabilizing the price for electronic books;

(b)    As a direct and proximate result Defendants' price fixing, DNAML has suffered actual damages, that are trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15);

(c)    DNAML be awarded its reasonable attorney's fees and costs of litigation in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15);

(d)    DNAML be awarded any and all fair and equitable damages

Dated:  September 16, 2013                    Respectfully submitted,

                                              CREIZMAN PLLC

                                    By: _____

                                              Eric M. Creizman
                                              565 Fifth Avenue, Fl. 7
                                              New York, New York 10017
                                              Tel.:  (212) 972-0200
                                              Fax:  (646) 200-5022
                                              Email:  ecreiz@creizmanllc.com

                                              *Local Counsel for Plaintiffs*

                                              Maxwell M. Blecher (pro hac vice pending)
                                              Jordan L. Ludwig (pro hac vice pending)
                                              BLECHER COLLINS PEPPERMAN &
                                              JOYE, P.C.
                                              515 S. Figueroa St., Suite 1750
                                              Los Angeles, CA  90071
                                              Tel:  (213) 622-4222
                                              Fax:  (213) 622-1656
                                              Email:  mblecher@blechercollins.com
                                                      jludwig@blechercollins.com

                                              *Lead Counsel for Plaintiffs*

37