UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
DNAML PTY, LIMITED,                     :
                                       :        13 Civ. 6516 (DLC)
                 Plaintiff,             :
                                       :        OPINION & ORDER
        -v-                             :
                                       :
APPLE INC.; HACHETTE BOOK GROUP,        :
INC.; HARPERCOLLINS PUBLISHERS, LLC;    :
VERLAGSGRUPPE GEORG VON HOLTZBRINCK     :
GMBH; HOLTZBRINCK PUBLISHERS, LLC       :
d/b/a/ MACMILLAN; THE PENGUIN GROUP, A  :
DIVISION OF PEARSON PLC; and SIMON &    :
SCHUSTER, INC.,                         :
                 Defendants.            :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff DNAML Pty, Ltd.:

Michael J. Guzman
Derek T. Ho
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC
Sumner Square
1615 M Street, N.W., Ste. 400
Washington, D.C. 20036

For defendants:

For Apple Inc.:

Theodore J. Boutrous, Jr.
Daniel G. Swanson
Gibson, Dunn & Crutcher, LLP
333 South Grand Ave.
Los Angeles, CA 90071

Lawrence J. Zweifach
Gibson, Dunn & Crutcher, LLP
200 Park Ave.
New York, NY 10166

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036

For Simon & Schuster, Inc.:

James Q. Quinn
Yehudah L. Buchweitz
Weil Gotshal & Manges LLP
767 Fifth Ave.
New York, NY 10153

For Penguin Group (USA) Inc.:

Saul P.  Morgenstern
Amanda C. Croushore
Kaye Scholer LLP
425 Park Ave.
New York, NY 10022

For Hachette Book Group USA, Inc.:

Walter Stuart
Richard Snyder
Samuel Rubin
Freshfields Bruckhaus Deringer US LLP
601 Lexington Ave.
New York, NY 10022

For HarperCollins Publishers LLC:

C. Scott Lent
Arnold & Porter LLP
399 Park Ave.
New York, NY 10022

For Macmillan Publishers Inc. and Verlagsgruppe Georg Von
Holtzbrinck GmbH:

Joel M. Mitnick
Sidley Austin LLP
787 Seventh Ave.
New York, NY 10019

DENISE COTE, District Judge:

DNAML Pty, Ltd. ("DNAML") brings this action against Apple Inc. ("Apple") and five book publishers ("Publishers"), pursuant to Section 1 of the Sherman Antitrust Act, to recover damages it asserts it sustained due to the defendants' conspiracy to fix prices and reduce competition in the e-book industry.  The defendants have moved to dismiss the complaint.  For the following reasons, the motions are granted as to any claims arising from either foreign sales of e-books or Apple's policies concerning its App Store, and are otherwise denied.

**BACKGROUND**

The complaint contains the following allegations, which are accepted as true for purposes of this motion.  DNAML is an Australian company.  It has been involved in the e-book industry, primarily as a software developer, for over a decade. It has offered software tools for authors to produce their own e-books and created websites that feature information about the e-book industry.

At some point, DNAML began selling e-books on its websites www.eBook.com and www.sharewareebooks.com.  Although DNAML did not have its own dedicated device for reading e-books, consumers could purchase an e-book from DNAML's websites and download the e-books to their devices.

DNAML predicated its sale of e-books on aggressive price competition.  It built software marketing tools to provide discounts and discounted bundling services.  It regularly offered discounts of over 20%.  During its "Happy Hour" promotions, it offered popular e-book titles at even steeper discounts.

DNAML sold e-books in bundles, allowing consumers to save money when purchasing multiple books at one time.  Sometimes, DNAML gave away bundles of e-books for free with the purchase of other digital products.  It also offered discount coupons.

Two of the Publishers -- Hachette Book Group, Inc. ("Hachette") and HarperCollins Publishers, LLC ("HarperCollins")[1] -- were the primary e-book suppliers to DNAML.  DNAML converted thousands of their titles to its own proprietary digital rights management format ("DRM").

As a result of their conspiracy with Apple, which is described below, certain unnamed Publishers demanded that DNAML sign agency agreements if DNAML wished to continue to sell their e-books.  The agency agreements gave the Publisher control over the retail prices of e-books.  As a result of these agency agreements, DNAML was forced to stop discounting its prices for

---

[1] HarperCollins is named in the caption of the complaint and mentioned in the text of the complaint, but it is not listed as a party in that portion of the body of the complaint that identifies each of the defendants.

e-books and offering discount-driven promotions.  This crippled DNAML and precluded it from establishing a foothold in the e-book retail market.

DNAML suffered a second injury.  It was in the final stages of developing an app known as the DNL Reader version 2.  This app would allow consumers to purchase and read e-books on an iPad, iPhone, and other tablet devices.  In 2011, intending to "eradicate retail competition and price transparency," Apple modified its policies regarding apps ("App Store Policies").  Under the modified App Store Policies, an e-book seller wishing to sell an e-book through its app had to pay Apple a 30% fee on top of what the retailer was already paying the publisher.  As a result, Apple's iBookstore became the only "practical" way to purchase e-books for Apple devices.  Knowing that it could no longer offer competitive prices, DNAML ceased development of its DNL Reader version 2 app for iPads and iPhones.

DNAML came to realize that it could not establish an e-book retail presence through its domain name eBook.com.  It sold the domain name in 2012.

The complaint's description of the antitrust conspiracy between Apple and five Publishers is drawn from the Department of Justice ("DOJ") complaint filed in this district against these six defendants in 2012.  DNAML's complaint also refers to this Court's Opinion of July 10, 2013, which found that Apple

had violated federal antitrust law, as alleged in the DOJ complaint.

In brief, the DNAML complaint asserts that Amazon, an internet retailer, offered newly released and bestselling e-books to consumers for $9.99 after it launched its Kindle e-reader.  Publishers feared that this $9.99 price would become a standard price of such e-books and deflate the prices of hardcover books.

The Publishers are five of the six largest publishers of trade books in the United States.  In addition to Hachette and HarperCollins, they include Verlagsgruppe Georg von Holtzbrinck GmbH and Holtzbrinck Publishers, LLC ("Macmillan"), The Penguin Group (USA), Inc. ("Penguin"), and Simon & Schuster, Inc. ("Simon & Schuster").  Knowing that they could not compel Amazon to raise e-book prices by acting alone, the Publishers settled on a strategy to raise retail e-book prices by replacing the wholesale model for selling e-books with an agency model.  Under the agency model, the Publisher sells the e-book to the consumer and sets the price for that sale.  In contrast, under the traditional wholesale model, retailers such as Amazon purchased the e-book from a publisher at the wholesale price and set their own retail price for the e-book.

Apple's entry into the e-book business provided the opportunity for this collective action to implement the agency

model and raise retail e-book prices.  Apple saw the agency model as one that would be highly profitable to it and one that would shield it from retail price competition.  Apple realized that one result of the scheme would be an increase in the retail prices of e-books.

Apple demanded a 30% commission from the Publishers on its sales of their e-books.  It also demanded that every Publisher force every other retailer of e-books to accept the agency model.  It accomplished this by insisting on a most favored nation or MFN clause that required each Publisher to guarantee that it would lower the retail price of each e-book in Apple's iBookstore to match the lowest price offered by any other retailer.  Apple also created pricing tiers that set caps for the maximum prices for e-books, linked to the title's hardcover list price.  The Apple agency agreements took effect on April 3, 2010 with the release of Apple's iPad.

The pricing caps in the Apple price tiers became, in practice, the new retail e-book prices.  The conspiracy between Apple and the Publishers raised and stabilized retail e-book prices.  It eliminated retailers' ability to compete on price. Consumers have paid tens of millions of dollars more for e-books since the conspiracy commenced.  The conspiracy also forced retailers like DNAML to cease e-book retail operations.

This action was filed on September 16, 2013.  Plaintiff had an opportunity to amend its complaint; it elected not to do so. Apple and the Publishers each filed a motion to dismiss on January 17, 2014.  The motions were fully submitted on March 28, 2014.

## DISCUSSION

The Publishers and Apple each contend that the complaint must be dismissed because it fails to allege antitrust standing in two separate ways.[2]  They argue that the complaint fails to allege that DNAML suffered an antitrust injury and that DNAML is an efficient enforcer of the antitrust laws.  After a brief discussion of the origins of the concept of antitrust standing, these arguments are addressed in turn.

Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws.  It entitles "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws" to treble damages.  15 U.S.C. § 15.  As the Supreme Court has explained, in passing this law, "Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices."  Associated Gen. Contractors of Ca., Inc. v. Ca. State Council of Carpenters, 459

---

[2]  Apple also asserts that DNAML is barred from seeking recovery for any lost foreign sales.  DNAML agrees.

U.S. 519, 530 (1983).  Congress "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  Id. at 534 (citation omitted).  Accordingly, courts have imposed "boundaries" on the invocation of this private enforcement tool to ensure that an action for treble damages is invoked in service of "the purpose of the antitrust laws:  to protect competition."  Gatt Commc'ns, Inc. v. PMC Assoc., LLC, 711 F.3d 68, 75 (2d Cir. 2013).

The limiting contours imposed over the right to pursue private actions for treble damages under Section 4 are "embodied in the concept of antitrust standing."  Id. (citation omitted). The assessment of antitrust standing is made at the pleading stage based on the allegations in the complaint.  Id.  There are "two imperatives" for antitrust standing.  Id. at 76.  A plaintiff must plausibly plead both that it suffered an antitrust injury and that it is an efficient enforcer of the antitrust laws.  Id.  Antitrust standing must be shown even when the plaintiff alleges a per se violation of the antitrust laws due to horizontal price fixing.  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990) ("ARCO").

## I.    Antitrust Injury

There is a three-step process to determine whether there is a sufficient pleading of antitrust injury:

> First, the party asserting that it has been injured by
> an illegal anticompetitive practice must identify the
> practice complained of and the reasons such a practice
> is or might be anticompetitive.  Next, we identify the
> actual injury the plaintiff alleges. . . .  Finally,
> we compare the anticompetitive effect of the specific
> practice at issue to the actual injury the plaintiff
> alleges.

Gatt, 711 F.3d at 76 (citation omitted).  Requiring a plaintiff

to demonstrate antitrust injury "ensures that the harm claimed

by the plaintiff corresponds to the rationale for finding a

violation of the antitrust laws in the first place."  Id.

(citing ARCO, 495 U.S. at 342).

DNAML has alleged that it was harmed by the price-fixing

scheme among Apple and the Publishers that they put into effect

in 2010.[3]  DNAML asserts that the conspiratorial adoption of the

agency model raised e-book prices through the elimination of

retail price competition, and thereby deprived DNAML of the

ability to set the retail prices for its e-books.  Due to this

conspiracy, DNAML was "forced to cease its efforts to establish

an e-book retail presence" since its business model was

---

[3] DNAML's complaint identified a second anticompetitive practice
which it alleged harmed it.  This was Apple's 2011 revision of
its App Store Policies.  DNAML did not plead facts to permit an
inference, however, that Apple's unilateral revision to its App
Store Policies constituted a violation of the antitrust laws.
In opposition to this motion, DNAML has abandoned its claim that
Apple's 2011 revision to its App Store Policies violated the
law.

"predicated on aggressive price competition" and the discounted bundling of e-books.

DNAML has identified an illegal anticompetitive practice. As this Court explained in its decision following a liability trial brought by DOJ and certain States against Apple,[4] the agreement between Apple and the Publishers to raise e-book prices was a per se violation of the antitrust laws.  See United States v. Apple Inc., 952 F. Supp. 2d 638, 694 (S.D.N.Y. 2013). To achieve their goal of raising e-book prices, the defendants eliminated retail price competition, arrogated to themselves the power to set retail prices for their e-books, and raised those prices dramatically.

The second prong of the test for an antitrust injury is the identification of the "actual injury" alleged by the plaintiff. Gatt, 711 F.3d at 76 (citation omitted).  "This requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct."  Id. (citation omitted).  DNAML has identified its injury.  It asserts that its inability to discount the prices for e-books led to the demise of its business and the loss of the profits it hoped to achieve from that business.

---

[4] All of the Publishers had settled in advance of the liability trial.

The third step for evaluating antitrust injury is the comparison of the anticompetitive effect of the practice to the injury alleged by the plaintiff.  This comparison requires more than a demonstration that the practice and injury are causally linked.  Id.  "Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful."  Id. (citation omitted).  See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487-88 (1977).  Even where the alleged conduct is per se unlawful under the antitrust laws, a plaintiff must still establish antitrust standing, as such conduct "may nonetheless have some procompetitive effects, and private parties might suffer losses therefrom."  ARCO, 495 U.S. at 342-43.  To establish standing, the plaintiff must show that its loss "stems from a competition-reducing aspect or effect of the plaintiff's behavior."  Id. at 344.  With such a showing, a plaintiff falls within "the zone of interests protected by" the antitrust laws.  Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1388 (2014) (citation omitted).

Courts have long permitted distributors to bring antitrust suits against manufacturers engaged in price-fixing.  For example, in Monsanto Co. v. Spray-Rite Serv. Corp., the Supreme

Court affirmed a verdict for a distributor, "a discount operation," against a manufacturer who conspired with other distributors to "maintain resale prices and terminate price cutters."  465 U.S. 752, 756, 765 (1984).  See also Pace Elecs., Inc. v. Canon Computer Sys. Inc., 213 F.3d 118, 122-23 (3d Cir. 2000) (holding wholesale dealer had antitrust standing in suit against manufacturer where dealer refused to comply with minimum resale price levels set by manufacturer and was terminated as a dealer).  Cf. ARCO, 495 U.S. at 336, 345 (noting, in rejecting manufacturer's suit against competitors who set a maximum price, that where anticompetitive consequences occur -- and specifically, where "the actual price charged under a maximum price scheme is nearly always the fixed maximum price" and so "the scheme tends to acquire all the attributes of an arrangement fixing minimum prices" -- that "consumers and the manufacturers' own dealers may bring suit").

Here, DNAML's alleged injury -- its inability to survive in the market in the absence of price competition, where its business model hinged on aggressive price competition -- is not some far-flung consequence of defendants' price-fixing, but rather is "precisely the type of loss that [defendants' conduct] would be likely to cause" by colluding to strip retailers of pricing discretion.  Blue Shield of Va. v. McCready, 457 U.S. 465, 479 (1982) (citation omitted).  DNAML alleges that, as a

discount e-book retailer, its "ability to compete was crippled" when the Publishers fixed prices.  Such an "intru[sion] upon the ability of [retailers] to compete and survive in the market" is one of the chief anticompetitive harms that may flow from collusive manufacturer price-fixing, and the exit of discount retailers increases retailer concentration, which tends to reduce nonprice competition as well.  ARCO, 495 U.S. at 335. Thus, DNAML's lost profits resulting from its inability to engage in price competition constitute injury "of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." Gatt, 711 F.3d at 76 (citation omitted).

Apple's argument to the contrary relies on cases holding that a manufacturer cannot complain of antitrust injury where competing manufacturers have conspired to inflate prices.  These cases are based on the simple premise that no injury should exist:  plaintiff manufacturer should be able to undercut the conspiring manufacturers with competitive pricing and win market share.  See Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 583 (1986); Freedom Holdings, Inc. v. Cuomo, 624 F.3d 38, 52 (2d Cir. 2010).  These cases are inapposite to the instant suit, as DNAML is not a competitor of the conspiring Publishers.  DNAML could not undercut the Publishers' artificially inflated prices -- indeed, DNAML's

14

alleged injury stems precisely from its inability to engage in price competition.

The Publishers erroneously assert that a distributor's lost profits cannot constitute antitrust injury from a price-fixing scheme, and that the only cognizable injury is the payment of inflated prices to the manufacturer, citing Gatt.  The Publishers misread Gatt, which held that, assuming a manufacturer's bid-rigging scheme violated federal antitrust laws, plaintiff distributor did not suffer antitrust injury from its "participation in or exile from such [a] scheme[]," as the plaintiff had "no right ab initio to participate" in and profit from such conduct.  711 F.3d at 77.  Gatt does not stand for the broad proposition that a distributor's lost profits from a manufacturer's price-fixing conspiracy do not constitute antitrust injury.  Lost profits and the payment of inflated prices are "two . . . conceptually different measures" of damages for antitrust injuries.  In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009).  A claim for lost profits can constitute a cognizable antitrust injury in the appropriate case.  Id.

Defendants also argue that their conspiracy did not deprive retailers of the opportunity to profit, and indeed retailers were guaranteed a 30% commission on each sale of the Publishers' e-books and they retained control over the retail prices of

other publishers' e-books.  This does not undermine DNAML's
allegation that it was injured by the conspiracy.  The
Publishers accounted for roughly 50% of the trade e-book market.
United States v. Apple Inc., 952 F. Supp. 2d 638, 685 (S.D.N.Y.
2013).  As a discounter, DNAML could not effectively compete in
a market infected to this extent by collusive price fixing.

Finally, the defendants argue that a retailer does not have
antitrust standing in a conspiracy to fix prices that was
"directed at consumers."  While it is undisputed that consumers
were directly injured by the defendants' illegal conspiracy to
fix and raise e-book prices, the elimination of retail price
competition also affected -- as those very words suggest -- the
competitive environment in which retailers operated.  Indeed,
consumers were injured in a scheme that took direct aim at
retailers' pricing authority.  "[T]he Sherman Act was enacted to
assure customers the benefits of price competition."  Associated
Gen., 459 U.S. at 538.  Thus, those retailers who wished to
compete on price suffered an antitrust injury of the type the
Sherman Act was designed to prevent.

## II.  Efficient Enforcer

In addition to establishing that it suffered antitrust
injury, DNAML must adequately allege that it would be an
efficient enforcer of the antitrust laws.  To determine whether
a plaintiff is an efficient enforcer of the antitrust laws, the

16

Court of Appeals for the Second Circuit directs courts to the following factors:

 (1) the directness or indirectness of the asserted injury;

 (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;

 (3) the speculativeness of the alleged injury; and

 (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Gatt, 711 F.3d at 78 (citation omitted).  The Supreme Court has recently discussed these factors in the context of the Lanham Act, noting that these latter two factors are "problematic" and that "potential difficulty in ascertaining and apportioning damages is not . . . an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects" and other relief may be available to plaintiff.  Lexmark, 134 S. Ct. at 1392.

With respect to the first factor, "[d]irectness in the antitrust context means close in the chain of causation."  Gatt, 711 F.3d at 78 (citation omitted).  This is essentially a proximate cause analysis and asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  Lexmark, 134 S. Ct. at 1390; accord Lotes Co., Ltd.

17

v. Hon Hai Precision Indus. Co., Ltd., 2014 WL 2487188, at *14
(2d Cir. June 4, 2014).  As such, it is a threshold requirement
which every plaintiff must meet.  Lexmark, 134 S. Ct. at 1392.

DNAML has alleged an injury that was proximately caused by
the violation of the antitrust laws.  It is true that the
immediate victims of the defendants' price-fixing conspiracy
were consumers.  Many paid higher prices for the Publishers' e-
books because of the conspiracy described in the complaint.
But, retailers were directly impacted as well; their injuries
were not "too remote" from the defendants' unlawful conduct.
Id. at 1390.  Defendants removed pricing discretion from
retailers; that directly injured retailers engaged in
discounting, as they were no longer able to compete on price.
These retailers are indisputably "competitors in the market in
which trade was restrained."  Associated Gen., 459 U.S. at 539.

As to the second factor, retailers like DNAML are "an
identifiable class of persons whose self-interest would normally
motivate them to vindicate the public interest in antitrust
enforcement."  Here, DNAML seeks recovery for lost profits that
resulted from defendants' conspiracy to end retail price
competition for e-books; its interests align with the public's
interest in promoting price competition.  It is true, as
defendants note, that the DOJ, the States, and a class of
consumers have already brought suit to recover for overcharges

18

to e-book purchasers, but none has sought recovery for injury to
retailers.  A retailer's lost profits are wholly distinct from
consumer overcharges, and to "[d]eny[] the plaintiff[] a remedy
in favor of a suit by [consumers] would thus be likely to leave
a significant antitrust violation . . . unremedied."  In re
DDAVP, 585 F.3d at 689 (citation omitted).  In any event,
"'[i]nferiority' to other potential plaintiffs can be relevant,
but is not dispositive."  Id. (citation omitted).

      Finally, taking the final two factors together, DNAML's
alleged injury -- the demise of its business -- has speculative,
as well as quantifiable, components.  Lost profits are quite
speculative, as DNAML had only just entered the market and it
will be difficult to determine what market share, if any, DNAML
would have won from the "large international conglomerates" that
DNAML alleges occupy the retail market.  Moreover, DNAML
continued to explore entry into this market for roughly a year
after the adoption of the agency model, which suggests that
DNAML will find it difficult to show that the adoption of the
agency model, and its elimination of retail price competition,
was the cause of the harm DNAML has identified in its complaint.
It appears that Apple's revision of its App Store Policies in
2011 was the more immediate and direct cause of harm to DNAML's
business plans.  Given these facts, DNAML's ability to show
reasonably certain lost profits due to the conspiracy may be

challenging in the extreme.  But, while DNAML will not be able to obtain damages "without evidence of injury proximately caused by [the defendants' antitrust violation, it] is entitled to a chance to prove its case." Lexmark, 134 S. Ct. at 1395.

After all, it has long been recognized that "it is as unlawful to prevent a person from engaging in business as it is to drive a person out of business," and a prospective market entrant may be eligible to recover in antitrust where it demonstrates it possessed the "intention and preparedness to engage in business." Am. Banana Co. v. United Fruit Co., 166 F. 261, 264 (2d Cir. 1908), aff'd, 213 U.S. 347 (1909) (citation omitted); accord Artista Records LLC v. Lime Grp. LLC, 532 F. Supp. 2d 556, 567 n.13 (S.D.N.Y. 2007) (Lynch, J.); see also 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 349, at 227 (3d ed. 2007) (noting that prospective market entrants are "typically found [to have standing under Section 4 of the Clayton Act] by a court that regards the plaintiff's entry as relatively likely").

DNAML, a new market entrant, is entitled to no lesser protection.  Here DNAML has made a number of specific allegations, including work over "several years" "acquiring industry-defining domain names . . . and developing and establishing an e-book store, a distribution platform, a digital rights management (DRM) solution, a payment platform, a reseller

platform, promotional tools, and authoring tools," that suffice to plead both an intention and preparedness to engage in business.  Indeed, DNAML pleads that it had "entered the market" and "successfully begun selling e-books on its various websites" before it was forced out of the market by defendants' conspiracy.

And to the extent that DNAML seeks "its loss of going-concern value or simply its lost investment," those damages -- particularly for any lost investment -- may be reasonably quantifiable.  DNAML represents that its investments total "millions of dollars."  Although, for the reasons set out above, DNAML may have difficulty proving causation, causation is adequately pled, and this component of DNAML's injury is not unduly speculative.  It is more than plausible that a discount retailer was harmed by a conspiracy to remove retailers' ability to discount e-books.  Nor is there concern about duplicative recoveries here, as DNAML seeks damages only for injury to its own business, which does not overlap with injury to either consumers or any other retailer.  Accordingly, DNAML is a sufficiently efficient enforcer of the antitrust laws to have antitrust standing to bring this suit.

**CONCLUSION**

Defendants' motions to dismiss of January 17, 2014 are granted as to any claims arising from either foreign sales of e-books or Apple's App Store Policies and otherwise denied.

SO ORDERED:

Dated:    New York, New York
          June 5, 2014

_____
          DENISE COTE
United States District Judge