**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**DNAML PTY, LIMITED**

               **Plaintiff,**

  **v.**

**APPLE INC.; HACHETTE BOOK GROUP,
INC.; HARPERCOLLINS PUBLISHERS,
L.L.C.; VERLAGSGRUPPE GEORG VON
HOLTZBRINCK GMBH; HOLTZBRINCK
PUBLISHERS, LLC d/b/a MACMILLAN; THE
PENGUIN GROUP, A DIVISION OF
PEARSON PLC.; and SIMON & SCHUSTER,
INC.**

               **Defendants.**

13 Civ. 6516 (DLC)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT**
**MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF UNDISPUTED FACTS ...................................................5

I.   DNAML Failed to Establish Itself in the E-book Industry.......................5

II.  DNAML Struggled to Attract Investors or Potential Acquirers ...........8

III. Agency Pricing Is Adopted and Has No Material Impact on DNAML's Business.................................................................................10

IV.  DNAML Ceases Operations ...............................................................10

ARGUMENT ...........................................................................................11

I.   DNAML CANNOT SHOW ANTITRUST INJURY .............................12

     A.   DNAML Cannot Establish Antitrust Injury Because It Cannot Prove That It Was Harmed By the Inability to Discount After the Adoption of Agency...............................................................12

     B.   DNAML Cannot Show "Antitrust Injury" From Agency Pricing That Acted To Lower DNAML's Prices ...................................15

II.  DNAML'S FAILURE WAS NOT CAUSED BY THE ALLEGED CONSPIRACY ...................................................................................16

     A.   Plaintiff Cannot Establish But-For Causation Attributable to Agency Because DNAML Was Doomed to Fail Before Agency Was Adopted................................................................................16

     B.   DNAML Cannot Distinguish Its Alleged Damages From Those Resulting From Causes Other Than The Alleged Conspiracy..................19

     C.   Plaintiff Cannot Rely On After-the-Fact Explanations to Create an Issue of Material Fact to Defeat Summary Judgment..........................22

III. DNAML HAS NO STANDING TO BRING AN ANTITRUST CLAIM............24

CONCLUSION .........................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Argus, Inc. v. Eastman Kodak Co.*,
    612 F. Supp. 904 (S.D.N.Y. 1985) ........................................................16, 17, 18, 19, 23

*Argus Inc. v. Eastman Kodak Co.*,
    801 F.2d 38 (2d Cir. 1986)............................................................................*passim*

*Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.*,
    No. 95-CV-7574-S(S), 1998 U.S. Dist. LEXIS 23084 (W.D.N.Y. July 7, 1998)............... 25

*Arista Records LLC v. Lime Grp. LLC*,
    532 F. Supp. 2d 556 (S.D.N.Y. 2007) ........................................................................ 15

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ........................................................................................... 12, 16

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ........................................................................................... 12, 15

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994).......................................................................................... 12

*Bickerstaff v. Vassar Coll.*,
    196 F.3d 435, 452 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999)............. 12

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982) ................................................................................................... 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................................................. 12, 13

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 322-23 (1986) ...................................................................................... 11

*Comcast v. Behrend*,
    133 S. Ct. 1426 (2013) ............................................................................................... 22

*DNAML Pty, Ltd. v. Apple Inc.*,
    25 F.Supp.3d 422 (S.D.N.Y. June 5, 2014)............................................................13, 14, 15

*Gatt Commc'ns, Inc. v. PMC Assocs, L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ..................................................................................... 13

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) ....................................................................... 16, 19, 21

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 425 (3d Cir. 1993) ............................................................................... 25

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972) ........................................................................................... 16

*Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*,
    510 F.2d 1140 (2d Cir. 1975) ............................................................................ 16

*Intimate Bookshop v. Barnes & Noble, Inc.*,
    No. 98 Civ. 5564 (WHP), 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) .............. 19, 21, 22

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    No. C07-01057 MJJ, 2007 U.S. Dist. LEXIS 61373 (N.D. Cal. Aug. 4, 2007) ..................... 25

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...........................................................................11, 12, 13, 14

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
    No. 98 CIV. 8272 (RPP), 2005 WL 22833 (S.D.N.Y. Jan. 5, 2005)
    *Aff'd*, 167 F. App'x 227 (2d Cir. 2005) ............................................................... 13, 14

*Sullivan v. National Football League*,
    34 F.3d 1091 (1st Cir. 1994) ............................................................................. 25

*Quarles v. General Motors Corp.*,
    758 F.2d 839 (2d Cir.1985) ............................................................................... 11

*U.S. v. Apple Inc.*,
    952 F.Supp.2d 638 (2013) ................................................................................ 15

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) ......................................................................... 16, 22

*United Mag. Co. v. Murdoch Mag. Distribution, Inc.*,
    393 F. Supp. 2d 199 (S.D.N.Y. 2005) ..........................................................21, 22, 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ...................................................................................... 16, 19

**Statutes**

15 U.S.C. § 1 ................................................................................................. 11

15 U.S.C. § 15 ............................................................................................... 16

**Other Authorities**

Fed. R. Civ. P. 56 ......................................................................................... 11

Areeda, Antitrust Law, ¶ 338 (Causation and Injury-In-Fact) .............................................. 19

## PRELIMINARY STATEMENT

DNAML PTY Ltd. ("DNAML") entered the e-books industry at least six years before Amazon, Inc. ("Amazon") introduced the Kindle.  Despite this potential early-mover advantage, DNAML was never successful and never posted a profit.  Unlike Amazon, DNAML did not focus on selling e-books.  Rather, DNAML considered itself a software company, focused on creating a proprietary e-book format.  And unlike Amazon, which also used a proprietary e-book format, DNAML failed to develop an "ecosystem" to support its format for customers.  While Amazon had an enormous e-book catalog and agreements to sell e-books from every major publisher, had created the Kindle e-reader on which customers could instantly purchase e-books, and had developed apps on which customers could read e-books on portable devices such as smartphones and tablets, DNAML had none of these tools.  DNAML's e-book catalog was tiny and included e-books from only two of the five Publisher Defendants,[1] and DNAML had no e-reader device, never created an app for Apple's portable devices, nor had a method for customers to read e-books on e-reader devices like the Kindle.  DNAML also had very few customers who purchased e-books (rather than made free downloads).

In September 2009, approximately two years after Amazon had launched its Kindle store, DNAML finally launched its flagship e-book retail site, ebook.com.  But DNAML candidly admitted to an advisor that

> Revenue is irrelevant as eBook.com is not a shop as such…our objective was for promotion of the DNL eBook format and not sales.  Sales were just by the way.  We also had only 12,000 eBooks on the site, *the eBooks had zero discount attached* – these were *the most expensive eBooks on the web and we knew that this would prevent sales*.

Rather, DNAML continued to focus on its proprietary e-book software system (which never caught on), and on creating a service that it could license to users to create their own e-book retail sites.  DNAML's own retail site, ebook.com, was intended only to "showcase" its software

---

[1] The "Publisher Defendants" are Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers L.L.C. ("HarperCollins"), Verlagsgruppe Georg von Holtzbrinck GmbH and Holtzbrinck Publishers, LLC d/b/a Macmillan (together, "Macmillan"), The Penguin Group, a Division of Pearson PLC ("Penguin"), and Simon & Schuster, Inc. ("S&S").

for potential licensees.  As a result of its inattention to the retail market, DNAML had only approximately 0.01% of the e-book retail market before agency pricing began.

Still, when the publisher defendants announced the agency pricing model, DNAML welcomed it as "a good development" that would provide "price protection" from other retailers that sold e-books below cost.  Months after the adoption of the agency model, DNAML still touted it as ending price wars among e-book retailers, particularly Amazon and Barnes & Noble.

Yet DNAML disregards these facts in its allegations in this action, which the record reveals is a naked attempt to capitalize on the prior litigation in this Court.  DNAML's complaint concocts a post-hoc claim that it suffered antitrust injury as a result of the Publisher Defendants' 2010 adoption of the agency pricing model because it could no longer discount a number of e-books or offer rewards to its customers.  Until this lawsuit, DNAML never identified agency as a problem preventing it from discounting or bundling e-books.  Now, DNAML has alleged that the agency pricing restrictions eliminated its ability to compete with, and beat, other highly successful retailers, such as Amazon and Barnes & Noble, and thereby destroyed its business. This Court denied the Defendants' motion to dismiss and permitted this action to proceed, accepting at the pleading stage that DNAML had alleged antitrust injury stemming from its supposed inability to engage in price competition because of the agency pricing model.  But the Court recognized, even based on DNAML's allegations, that it may be difficult for DNAML to show that "the agency model…was the cause of the harm."

Discovery has demonstrated that there is absolutely no evidence to support its claims. DNAML was not a discounter.  DNAML never even sold e-books from three of the five Publisher Defendants at any time.  More importantly, the evidence shows that, before and after agency, DNAML did not try to compete on price against major retailers like Amazon and Barnes & Noble and did not offer competitive prices.  The Publisher Defendants' motion for summary judgment should be granted for four separate reasons:

*First*, DNAML cannot prove that it suffered an antitrust injury.  DNAML's claim that the agency pricing model somehow destroyed its business because DNAML could not discount e-

book prices or offer rewards is not supported—indeed is directly contradicted—by the contemporaneous record.  DNAML only sold e-books from two of the five Publisher Defendants.  DNAML's complaint touts "Happy Hour" promotions in which DNAML sold e-books for as little as $5.  However, DNAML's transactional records show that it did not offer pricing that was competitive with other retailers, and 98% of its sales prior to agency were at digital list price ("DLP")—approximately double the price offered by Amazon and Barnes & Noble—confirming DNAML's statements, internally and to investors, that it did not discount e-books, and instead sold "*the most expensive eBooks on the web*."  In fact, agency pricing actually *lowered* DNAML's e-book prices.  DNAML also argues that the agency model prevented it from selling e-books in bundles with its software, whereby a customer would either purchase e-books at full list price and receive a free copy of DNAML's software, or purchase DNAML's software at full price (normally well above the price of an e-book) and receive a free or discounted e-book.  However, after the launch of ebook.com, sales from bundles made up a tiny portion of DNAML's scant sales, and sometimes represented little, if any, discount from the list price of the bundled items.  Accordingly, the implementation of agency pricing did not injure DNAML and certainly did not cause it to fail.

  *Second*, DNAML cannot prove but-for causation because the contemporaneous record shows there were at least eighteen other factors that led to DNAML's failure and that agency pricing had little if any effect on its business, discussed *infra*, Part II.B.  None of DNAML's eighteen identified problems had anything to do with the agency pricing model.  Further, as noted, DNAML never sold e-books from three of the five Publisher Defendants, never made a profit at any time in its history, and was not on track to turn a profit as of the time agency pricing was adopted.  And DNAML's meager e-book sales were never more than a tiny fraction of its total business.

  By the time DNAML finally launched ebook.com in 2009, Amazon had already gained the vast majority of market share, and Barnes & Noble entered the market with the cachet of being the largest print book retailer.  Meanwhile, DNAML was struggling to raise the funding

necessary to keep it from insolvency.  And, even though DNAML made substantial reductions to its costs—including reducing its staff—DNAML never established itself as a viable e-book software developer, much less a viable e-book retailer.  Its failure was inevitable well before the adoption of the agency model, and its prospects were unaffected by agency.

The Second Circuit's decision in *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986), in which the court affirmed summary judgment for the defendant on almost identical facts to this case, is instructive.  In *Argus*, the Second Circuit found that the plaintiff could not establish but-for causation where the evidence showed that the plaintiff—which, as here, attempted to follow a successful antitrust claim by alleging it was also damaged by the alleged antitrust violation—was in dire financial condition before the alleged antitrust violation and contemporaneous statements contradicted plaintiff's subsequent claim that the alleged antitrust violation caused its harm.  DNAML's theory fails for the same reasons here.

*Third*, even if DNAML was not on a path to failure prior to agency, DNAML cannot possibly show that agency pricing—i.e., the inability to discount—was a substantial factor or material cause of its failure.  While there is no contemporaneous evidence to support DNAML's claim that its business model was based on discounting, there is overwhelming evidence showing that numerous factors unrelated to agency pricing harmed DNAML's business.  The record shows that DNAML was failing as a result of mismanagement and inferior technology that it could never make profitable.  Further, DNAML welcomed the agency model—both at the time that agency was announced, and well after agency pricing had been established—as "a good development" and a "terrific set of events" for its business because it would end the "price wars" resulting in "below cost sales" by Amazon and Barnes & Noble.

*Fourth*, DNAML lacks standing to bring an antitrust claim.  DNAML's claim belongs to "Old DNAML," the entity that was supposedly harmed by the alleged conspiracy, and there is no evidence that "Old DNAML" assigned its antitrust claim to the current DNAML entity.

DNAML cannot account for or disaggregate the numerous other causes of its demise or otherwise present concrete evidence that supports its theory about its supposed discount-oriented

business model.  DNAML can only adduce after-the-fact assertions from its CEO, and expert opinions that rely upon baseless assumptions.  The Second Circuit in *Argus*, however, specifically rejected the reliance on such "tactically convenient" testimony unsupported by contemporaneous evidence and an expert's "naked conclusions" when there was overwhelming, inconsistent evidence from contemporaneous documents.  Thus, there is no genuine issue of material fact as to causation, and the defendants are entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS[2]

### I.    DNAML Failed to Establish Itself in the E-book Industry

DNAML was founded around 2000 or 2001 by Adam Schmidt ("Schmidt").  56.1 Stmt. ¶ 1.  DNAML was intended to be an "end-to-end" e-book software and distribution company.  *Id.* ¶¶ 1, 3.  Through the 2000s, DNAML focused most of its resources on developing its software platform, rather than creating an e-book retail store.  *Id.* ¶¶ 1, 3.  This strategy included developing a software platform including a proprietary e-book format, a proprietary Digital Rights Management ("DRM") format, and the software necessary to read those formats on computers.  *Id.* ¶¶ 9-14.  However, DNAML's e-book and DRM formats ("DNL" and "DNL2") failed to gain widespread acceptance.  The DNL format was only readable by Windows- and Mac OS-based computers (but not portable devices), while the DNL2 format, which was not completed until 2011, was only readable on the DNL App for Android devices.  *Id.* ¶ 9.  Prior to the development of the DNL2 format, DNAML's e-books were only readable on desktop and laptop computers, but not on portable devices.  *Id.* ¶ 9.  DNAML never created its own e-reader device, and its e-books were not readable on the most popular e-reader devices.  *Id.* ¶¶ 10-13.  DNAML also never created an e-book format that could be read on portable Apple devices such as the iPad and iPhone.  *Id.* ¶ 13.

While companies like BooksOnBoard and Diesel opened their e-book stores in 2005 and

---

[2] The undisputed facts are more fully set forth in the Publisher Defendants' Local Rule 56.1 Statement ("56.1 Stmt.") that has been submitted along with this Memorandum of Law in support of the Publisher Defendants' Motion for Summary Judgment.

2006, followed by Amazon in 2007, DNAML did not launch its flagship site, ebook.com, until late 2009, around the time that Barnes & Noble also joined. *Id.* ¶ 41. However, ebook.com was not intended to be a competitive e-book retail store—it was intended only to be a "showcase" for DNAML's technology. *Id.* ¶ 42. DNAML had developed ebook.com as an e-book retail platform that would allow DNAML's customers to license DNAML's software and platform to create their own e-book retail stores. *Id.* ¶¶ 42-44. Yet some publishers criticized DNAML's software as inferior compared with the software from competitors, including Amazon. *Id.* ¶ 14.

DNAML offered a very limited selection of e-book titles to customers. Some of the titles offered by DNAML were available only in DNL or DNL2 format, but not in both formats. *Id.* at ¶ 10. DNAML also struggled to convert e-book titles into its formats. *Id.* ¶¶ 25-29. As of April 2009, DNAML offered 1,668 titles for sale, barely 1% of the over 150,000 titles that Amazon offered at that time. *Id.* ¶ 31. DNAML offered e-books from only two of the five Publisher Defendants, Hachette and HarperCollins, and never sold e-books from Macmillan, Penguin, or S&S. *Id.* ¶ 50. It sold a minimal number of titles from even the publishers it had deals with. In its best month of sales for Hachette, DNAML sold only 320 books, and in the second best month of Hachette sales for which data is available, DNAML sold only 40 Hachette titles. *Id.* ¶ 62. Its sales of HarperCollins titles were even less significant. *Id.* DNAML did not devote significant resources to its e-book retail sales, and did not expect to derive significant revenues from such sales, because "ebook.com [wa]s not a shop as such ... [DNAML's] objective was for promotion of the DNL eBook format and not sales." *Id.* ¶¶ 23, 42. DNAML planned for most of its income to derive from software and platform licensing fees, rather than from margins from e-book sales. *Id.* ¶¶ 42-46, 54.

As a result, DNAML never had a significant market share. As reflected in the chart below from Exhibit 9 to the Declaration of Yehudah L. Buchweitz in Support of Defendants' Motion for Summary Judgment (Carlton Report),[3] DNAML's share of e-book revenues peaked

---

[3] The Buchweitz Decl. attaches true and correct copies of deposition transcripts, deposition exhibits, expert reports, filings from this action or related cases, and documents produced in this case. All documents cited to herein are exhibits to the Buchweitz Decl. and will be cited as "Ex. _."

at 0.21% in September 2008, which was a year before the official launch of ebook.com. 56.1 Stmt. ¶ 6. For most of its existence as an e-book retailer, DNAML had no higher than a 0.01% share of the e-book market. *Id.* Notably, the launch of ebook.com in September 2009 did not create any increase in DNAML's e-book sales, and DNAML did not see any appreciable increase in sales in the six months between the launch of ebook.com and the adoption of the agency model. *Id.* Meanwhile, in March 2010, Amazon, Barnes & Noble, and Sony had captured 98% of the market and Apple was poised to enter. Ex. 9 (Carlton Report) ¶ 13. Diesel and BooksOnBoard reached market shares of around 4% in early 2008, before seeing their shares plunge as Amazon and Barnes & Noble entered the market. *Id.* Table 1.

**Plaintiffs' Shares of e-Book Industry Revenues (January 2008 – March 2010)**



Sources: *See* Figure 2.

DNAML's sales were not only a very small portion of the e-book industry, but they were also a very small portion of DNAML's total revenues. For example, between November 2008 and March 2009, DNAML had only 889 e-book sales *total*, at an average of $16.99. 56.1 Stmt. ¶ 24. In its fiscal year ending June 2009, DNAML had only AUD$39,802.65 in e-book sales, out of total revenues of AUD$799,426.70 (less than 5% of total revenues, which primarily included software sales and online textbook registration). *Id.* ¶ 60; Ex. 9 (Carlton Report) ¶ 95, n. 155.

Although DNAML alleged that it priced aggressively "much like Amazon," in truth it

rarely offered any discounts at all.  DNAML's few e-book sales were almost always sold at
DLP—which was approximately double the price that Amazon charged for the same e-books—
and were according to Schmidt "the most expensive eBooks on the web."  56.1 Stmt. ¶ 64.
DNAML rarely offered any price discounts even below the publishers' DLP, let alone in
comparison with its competitors' prices.  *Id.*  DNAML also sold very few e-books via bundles.
*Id.* ¶ 68.  DNAML's sales data show that its prices were significantly higher than its competitors.
*Id.* ¶¶ 63-67.  Schmidt also wrote that "99.99% of the time eBooks on eBook.com have been sold
at full [DLP]."  *Id.* ¶ 64.  DNAML could not compete with below-cost $9.99 prices for new
release e-books from Amazon and Barnes & Noble.  *Id.* ¶ 52.  Rather, DNAML recognized that
it would benefit from the end of those "price wars."  *Id.* ¶¶ 50-52.  After agency was in place,
DNAML's CEO continued to identify agency pricing as a benefit to DNAML.  *Id.* ¶ 52.   And
there is no evidence that DNAML pursued a strategy of discounting non-agency e-books after
the Defendants adopted the agency model – even though DNAML had agreements to sell e-
books from only two agency publishers and sold e-books from non-agency publishers.[4]

## II.    DNAML Struggled to Attract Investors or Potential Acquirers

DNAML never made a profit.  *Id.* ¶ 15.  As a result, it was constantly searching for
funding from investors, Australian government grants, an overdraft line in its bank accounts, and
other sources.  *Id.* ¶¶ 17-22; 29-30; 34-37.  Because of DNAML's poor financial performance, its
chairman had to personally guarantee outside investments in order to secure funding from
investors.  *Id.* at ¶ 18.

In mid-2009, DNAML shifted from finding investors to finding an acquirer.  *Id.* ¶¶ 37,
47.  To make itself appear to be an attractive investment, DNAML needed additional short-term

---

[4] DNAML's expert, James Ratliff, conducted no analysis to determine whether DNAML discounted.  Ex. 6 (Ratliff
Dep.) 116:23-118:25.  Ratliff tried to explain that he failed to address these issues because discounting is a valuable
tool even if a retailer did not offer the lowest prices, but the explanation is purely theoretical and is not accompanied
by any analysis of the actual benefit to DNAML from discounting.  *See, e.g.*, Ex. 10 (Ratliff Reply) ¶¶ 51-62.  As
DNAML's own documents show, DNAML did not pursue a strategy of discounting.  *See infra* §II.A.  Ratliff's
failure to conduct this type of analysis is not surprising as he had no prior experience analyzing economic causation
issues.  Ex. 6 (Ratliff Dep.) 10:2-11.

funding to continue its operations and finish certain projects that could have increased its value. *Id.* ¶ 21.  But its current investors and board members were frustrated with the management and direction of the company at that point, and DNAML's board members required Schmidt, DNAML's CEO and controlling shareholder, to agree to restructure the DNAML shareholder agreement so that he would no longer control the use of funds meant to shepherd the company through its sale.  *Id.* ¶ 38-40.

Despite distributing DNAML's materials to more than one hundred potential acquirers, DNAML did not attract a single offer.  *Id.* ¶ 53.  Google noted that DNAML was "too small and too early" for Google to purchase—even after nearly a decade of development, its software was not ready for the market.  *Id.* ¶ 55.  Google later purchased a different e-book technology firm, and DNAML's advisors noted three advantages that Google's acquisition had over DNAML: 1) patented technology; 2) a USA-based team; and 3) a management team with e-book publishing and technology expertise.  *Id.* ¶ 55.  Other potential investors, and DNAML's current investors and advisors, noted additional major issues facing DNAML, including:

- Potential buyers were too integrated in alternative e-book platform solutions, *Id.* at ¶ 53; Ex. 29 (Schmidt Dep. Ex. 16);

- Potential buyers had progressed too far in developing or implementing alternative solutions, *Id.*;

- Potential buyers were looking for solutions not available from DNAML, *Id.*;

- DNAML's revenues were too insubstantial and were not growing, *Id.*;

- Minimal investment in sales and marketing compared with competitors, 56.1 Stmt. ¶ 56;

- Poor e-book offerings and assets with negligible chances of establishing a viable commercial position within the ebook value chain, given the context of rapid and aggressive development of the market by several large, well-funded global players, *Id.* ¶ 58;

- Products that seemed "unfinished or buggy," *Id.*.

DNAML's investors and advisors likewise recognized additional problems facing DNAML.  DNAML did not have the expertise, or the resources to develop or purchase the

expertise, to become a major player in online retailing.  *Id.* ¶ 29.  Rather, DNAML focused on developing software, but had not proven that it could run a profitable software business.  *Id.* ¶ 30.

## III.    Agency Pricing Is Adopted and Has No Material Impact on DNAML's Business

On April 1, 2010, the Publisher Defendants implemented the agency pricing model where the publisher set the retail price for an e-book and the retailers sold the e-book as the publisher's agent, earning a commission on the sale price.  *Id.* ¶ 49.  DNAML signed an agency agreement with Hachette, but not with HarperCollins, Penguin, Macmillan, or S&S.  *Id.* ¶ 50.  DNAML was minimally affected by the adoption of the agency pricing model.

Yet from the time he heard about the agency model until well after it was implemented, DNAML's CEO repeatedly touted agency pricing as good for DNAML.  *Id.* ¶ 51.  In February 2010, Schmidt wrote that Amazon's agreement to the agency model was "a good development" with "absolutely amazing timing" and would "provide price protection."  *Id.*  Six months after agency was adopted, in October 2010, Schmidt re-affirmed that agency resulted from a "terrific set of events" that ended Amazon's and Barnes & Noble's "price wars" and "below cost sales."  *Id.* ¶ 52.  Schmidt wrote numerous other emails exclaiming DNAML's good fortune as a result of the end of such "price wars."  *Id.*

## IV.    DNAML Ceases Operations

After the adoption of agency, DNAML continued to struggle to attract investors or acquirers, just as it had in preceding years.  As noted above, potential investors continued to identify DNAML's lack of revenues or growth as a major issue.  *Id.* ¶ 53.  Schmidt noted that DNAML's e-book sales revenue had not increased during 2010—while the global e-book market had grown swiftly—because DNAML was resource constrained and lacked necessary investment.  *Id.* ¶ 56.  During this time, neither DNAML, its advisors, nor potential investors or acquirers noted that the restrictions on its ability to discount had made DNAML less attractive than it had been prior to the adoption of agency or affected DNAML's sales.  *Id.* ¶¶ 55-58.  Rather, potential investors and DNAML's advisers recognized that DNAML was too far behind

much better-funded companies like Amazon and had very little prospect of competing.  *Id.* ¶ 58.

DNAML searched for a buyer for its ebook.com domain name but failed to find a purchaser

willing to meet DNAML's initial price objective.  *Id.* ¶ 69.  DNAML stopped selling e-books in

January 2012 when it eventually sold ebook.com.  *Id.*

Looking to salvage something from a defunct business, DNAML filed this lawsuit

against Apple Inc. ("Apple") and the Publisher Defendants (together with Apple, "Defendants"),

asserting claims for violation of the Sherman Act (15 U.S.C. § 1).  *Id.* ¶ 5.  The Defendants

moved to dismiss the complaint on the ground that DNAML failed to adequately allege antitrust

injury.  *Id.* ¶ 7.  The Court denied the motion but specifically found that Plaintiff "will not be

able to obtain damages 'without <u>evidence</u> of injury proximately caused by [the defendant's

antitrust violation].'"  *Id.* ¶ 8 (emphasis in original).

## ARGUMENT

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he plain

language of Rule 56[] mandates the entry of summary judgment…against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.  In such a situation, there can be

'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[M]ere conjecture or speculation by the

party resisting summary judgment does not provide a basis upon which to deny the

motion."  *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985); *see also*

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a party

"must do more than simply show that there is some metaphysical doubt as to the material facts").

To survive summary judgment, a plaintiff must show antitrust standing by showing it has

suffered "antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful,"' *and* that injury must be caused by an antitrust violation. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537-44 (1983); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994). "When the fact of injury is in issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *Argus*, 801 F.2d at 42 (internal citations omitted). Testimony asserting a mere conclusion but "devoid of any specifics" and "any concrete particulars," is "insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999). The required showing to survive summary judgment is heightened when the "factual context renders [a] claim implausible." *Matsushita*, 475 U.S. at 587. "In such circumstances, 'more persuasive evidence…than would otherwise be necessary' must be adduced." *Argus*, 801 F.2d at 42 (quoting *Matsushita*, 475 U.S. at 587).

DNAML's claims fail because it cannot plausibly show that it suffered antitrust injury due to the alleged conspiracy and it cannot show that it failed, or was otherwise injured, due to the alleged conspiracy.[5] DNAML has provided no reliable evidence to support its claims, let alone the kind of heightened showing required to withstand summary judgment here.

## I.   DNAML CANNOT SHOW ANTITRUST INJURY

### A.   DNAML Cannot Establish Antitrust Injury Because It Cannot Prove That It Was Harmed By the Inability to Discount After the Adoption of Agency

To establish antitrust standing, a plaintiff must show that it has suffered an "antitrust injury." *See Brunswick*, 429 U.S. at 489. An antitrust injury is more than an injury causally linked to an alleged antitrust violation; it is an "injury of the type the antitrust laws were intended

---

[5] Defendants do not concede the existence of an alleged conspiracy but do not raise or argue any issues related to such a conspiracy at this stage of the proceedings because, even if Plaintiff could establish that such a conspiracy did exist, its claims would still fail as a matter of law on several other independent grounds.

to prevent and that flows from that which makes defendants' acts unlawful." *See id.* at 489; *Gatt Commc'ns, Inc. v. PMC Assocs, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013); *DNAML Pty, Ltd. v. Apple Inc.*, 25 F.Supp.3d 422, 428 (S.D.N.Y. June 5, 2014). Accordingly, a plaintiff cannot establish antitrust injury where it "actually tended to benefit" from the alleged conduct. *Matsushita*, 475 U.S. at 583; *see also Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 CIV. 8272 (RPP), 2005 WL 22833, at *20 (S.D.N.Y. Jan. 5, 2005) *aff'd*, 167 F. App'x 227 (2d Cir. 2005) (granting summary judgment, in part, because higher fees allegedly earned by concert promoters tended to benefit plaintiff promoter).

DNAML alleges that, as a result of agency, it suffered antitrust injury because it could no longer bundle e-books, discount e-book prices, or offer rewards, which resulted in the destruction of its business. *See* Ex. 11 (Compl.) ¶¶ 89-90, 93-94, 96-97. This Court, in its decision on the motion to dismiss DNAML's complaint, allowed the case to proceed because DNAML had alleged that its business model was "predicated on aggressive price competition and the discounted bundling of e-books." *DNAML*, 25 F. Supp. 3d at 427; *see also id.* at 429 ("DNAML's lost profits resulting from its inability to engage in price competition constitute injury 'of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful.'").

Contrary to these allegations, however, the record shows that DNAML's business model did not "hinge[] on aggressive price competition" or on bundling. DNAML's business model did not even hinge on selling e-books. DNAML's complaint dances around the reality that it was not an e-book retailer, did not intend to become an e-book retailer, and did not expect that significant revenues would come from selling e-books. Ex. 11 (Compl.) ¶¶ 87-88, 91.[6] DNAML concedes that it had been "involved in the e-book industry for over a decade—primarily as a

---

[6] DNAML produced a set of projections indicating that it expected significant future revenues from e-book sales. *See, e.g.*, Ex. 26 (DNAML_0004402). The metadata on this and similar documents indicate that they were last modified in 2013, and no similar documents last modified in 2010 were produced. 56.1 Stmt. ¶ 71. Defendants contend that the modifications suggest that DNAML altered evidence, and briefing related to this issue is subject to a parallel schedule. 13-cv-6516 Dkt. 132. Contemporaneous documents indicate that DNAML believed that its future revenues would come from software and platform licensing. 56.1 Stmt. ¶ 71.

software developer." *Id.* ¶ 87.  But it then blurs this history as a software developer, and not a retailer, by alleging that DNAML "was formed in the nascent period of the e-book industry when competition was vibrant and businesses had not yet become so entrenched that market entry was effectively futile." *Id.* ¶ 91.  By the late 2000s, DNAML had not yet established itself in the e-book industry even as a software provider.  By the time DNAML launched ebook.com in 2009, due to Amazon's dominance, entry into the e-book retail space was "effectively futile."

Rather than engage in "aggressive price competition," the record shows that DNAML rarely offered any discount below the publishers' DLP and sold very few e-books via bundles. As shown by the record and Dr. Carlton's analysis, DNAML offered "the most expensive eBooks on the web" and sold nearly all of its e-books at the full DLP.  DNAML did not discount, and thus recognized that it stood to benefit from the end of "price wars" between Amazon and Barnes & Noble and other retailers.  Thus, the record is clear that DNAML did not intend to create a competitive e-book store, did not expect to be a profitable e-book retailer, and did not discount the prices of e-books.  Accordingly, the record is conclusive that DNAML's business model ***was not*** "predicated on aggressive price competition, much like Amazon's was." s*ee* Ex. 11 (Compl.) ¶ 89; *see also DNAML*, 25 F. Supp. 3d at 427.  DNAML cannot establish antitrust injury based on the record in this case.  *See Matsushita*, 475 U.S. at 582-83, 586 (holding that respondents/plaintiffs could not recover for alleged conspiracy to charge higher prices because "respondents stand to gain from any conspiracy to raise the market price"); *Rowe Entm't*, 2005 WL 22833, at *20.[7]

---

[7] The Expert Report of James D. Ratliff, dated March 13, 2015 ("Ratliff Report"), submitted on DNAML's behalf, which concluded that "the imposition of the agency model caused by the conspiracy materially injured plaintiffs' businesses," is flawed because it ignores and assumes away all of the evidence directly contradicting DNAML's claims, such as DNAML's data and statements showing that DNAML did not discount prices.  In particular, Ratliff ignores that DNAML did not actually discount relative to its rivals and that, in fact, DNAML had, on average, much higher retail prices than the major retailers.  Ex. 9 (Carlton Report) ¶¶ 47-49.  He also ignores that the agency model prohibited Amazon and other competitors from continuing the massive discounts that were harming DNAML's business.  *Id*. ¶¶ 29-33.

**B.** **DNAML Cannot Show "Antitrust Injury" From Agency Pricing That Acted To Lower DNAML's Prices**

To establish antitrust standing, a plaintiff "must show that its loss 'stems from a competition-*reducing* aspect or effect of the plaintiff's behavior.'" *DNAML*, 25 F.Supp.3d at 428 (quoting *Atl. Richfield*, 495 U.S. at 344) (emphasis in original). Further, the Supreme Court held in *Atlantic Richfield* that a plaintiff cannot show antitrust injury where its injury as a competitor "does not resemble any of the potential [anticompetitive] dangers" presented by the defendants' alleged conduct. 495 U.S. at 336. DNAML's alleged loss is the demise of its business caused by its inability to discount. *DNAML*, 25 F.Supp.3d at 428. But the actual effect of the alleged conspiracy was to cause DNAML's (few) sales of the Publisher Defendants' e-books to have *lower* prices after agency than before agency. This cannot establish DNAML's antitrust standing because it does not show any harm to competition. *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 570 (S.D.N.Y. 2007) ("To the extent counter-defendants' (non-predatory) price-fixing agreement resulted in lower prices being charged by retailers, '[t]his is not *antitrust* injury . . . .'") (quoting *Atl. Richfield,* 495 U.S. at 337) (emphasis in original).

The record shows that agency pricing actually made DNAML's prices ***more*** competitive and ***lowered*** its prices for e-books. DNAML's average price for non-agency e-books was 98% of the Publishers' DLP, and 98% of its sales were at the full DLP. 56.1 Stmt. ¶ 64. DNAML's e-book prices were approximately 100% higher than Amazon's average prices for the Publishers' e-books prior to agency. Ex. 9 (Carlton Report) ¶ 47. This Court found that after the move to agency, Amazon's average prices increased between 12% and 44% for the Publisher Defendants' e-books. *U.S. v. Apple*, 952 F. Supp. 2d 638, 683 (S.D.N.Y. 2013). Agency thus lowered DNAML's average prices. Its injury "does not resemble any of the potential [anticompetitive] danger" alleged in the Complaint, and thus is not antitrust injury. *Atl. Richfield*, 495 U.S. at 336; *Arista Records*, 532 F. Supp. 2d at 570 ("To the extent counter-defendants' (non-predatory) price-fixing agreement resulted in lower prices being charged by retailers, '[t]his is not *antitrust* injury . . . .'") (quoting *Atl. Richfield,* 495 U.S. at 337) (emphasis in original).

15

## II.     DNAML'S FAILURE WAS NOT CAUSED BY THE ALLEGED CONSPIRACY

A plaintiff must show that its damages were actually *caused* by the alleged anticompetitive conduct to recover under Section 4 of the Clayton Act.  *See* 15 U.S.C. § 15; *Assoc. Gen. Contractors*, 459 U.S. at 537 (plaintiff must prove a "causal connection" between alleged conduct and injury); *Argus*, 801 F.2d at 41.  But, as the Supreme Court has recognized, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 n. 14 (1972); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476-77 (1982) ("'[D]espite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable.'").  Instead, there must be a causal connection "sufficient to show that the violation was a 'material cause' or 'substantial factor' in causing plaintiff's injuries." *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 918 (S.D.N.Y. 1985) *aff'd*, *Argus*, 801 F.2d 38 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)).  "The proof required to show *causation* of damages is greater than that required to prove the *amount* of damages, where a plaintiff is afforded more latitude due to the 'vagaries of the marketplace.'" *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993); *accord*, *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988). DNAML cannot satisfy these standards.  Instead, the overwhelming evidence shows that DNAML was on a path to failure well before agency.  Even if DNAML could establish but-for causation, the presence of numerous other reasons for its failure make it impossible to establish that agency was a "material cause" or "substantial factor" in DNAML's failure.

### A.     Plaintiff Cannot Establish But-For Causation Attributable to Agency Because DNAML Was Doomed to Fail Before Agency Was Adopted

A plaintiff cannot establish an antitrust claim if it would have suffered the same injuries it alleges even if the alleged antitrust violation never occurred.  *Argus*, 801 F.2d at 41 ("[L]ack of causation in fact is fatal to the merits of any antitrust claim."); *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1142 (2d Cir. 1975).  Thus, where a company

16

is in "dire financial shape" prior to the alleged antitrust violations, it is unlikely that the destruction of that business was caused by antitrust activity. *See Argus*, 612 F. Supp. at 920-21; *see also Argus*, 801 F.2d at 43 (affirming decision, in part, because plaintiff was in "severe decline well before" the alleged antitrust violation). But-for causation is particularly difficult to show when documents created before the alleged antitrust violation reveal that the company was on a path to failure. *Argus*, 801 F.2d at 43-44 (finding no plausible causation in fact where plaintiffs were "wallowing in deep financial trouble" at time of alleged antitrust violation).

The record unambiguously shows that DNAML was an unsuccessful business headed for failure before the Publisher Defendants adopted the agency distribution model. And the evidence points to numerous causes of DNAML's failure unrelated to agency pricing. DNAML was nearly insolvent. 56.1 Stmt. ¶¶ 19, 32, 34, 37, 48. Further, it did not have the resources or experience to be competitive as a retailer, and recognized that the e-book retailing industry was not likely to be a successful focus for the company. *Id.* ¶ 29.

As a retailer, DNAML did not and could not compete against Amazon and Barnes & Noble (or other retailers for that matter) in any of the essential categories on which an e-book retailer could compete. As noted above, DNAML made essentially no effort to compete on price. *Supra* § I.A. And DNAML lacked the volume of titles offered by other retailers. 56.1 Stmt. ¶¶ 25, 31. DNAML also failed to develop apps, or at best, lagged years behind other retailers that sold e-books that could be read on portable devices, despite recognizing that the future of the e-book industry was mobile devices. *Id.* ¶¶ 9-13. For these reasons, Defendants' expert, Dennis Carlton, a former chief economist at the Department of Justice, concluded that DNAML was at a competitive disadvantage relative to major retailers like Amazon and Barnes & Noble. Ex. 9 (Carlton Report) ¶¶ 19-26. Further, Plaintiffs' expert *conceded* that each of the plaintiffs was at a competitive disadvantage, before and after agency, because larger competitors had significant economy of scale advantages. Ex. 8 (Ratliff Report) ¶¶ 20, 127; Ex. 6 (Ratliff Dep.) 108:20-109:16. DNAML's was simply not a viable business model by any measure.

As a result of these and other factors, DNAML was in dire financial shape by early 2009.

56.1 Stmt. ¶¶ 32-34.  It was never profitable prior to agency even with its generous annual subsidies from the Australian government, which were necessary for DNAML to survive.  *Id.* ¶¶ 15-17.  DNAML had also laid off a number of employees, which risked leaving the company without enough resources to continue to develop its products.  *Id.* ¶ 19.  DNAML made other cuts that risked "making DNAML valueless" because it lacked revenue.  *Id.* ¶ 39.  Even with the cuts, DNAML continued to lose money and was heading towards bankruptcy.  *Id.* ¶ 48.  And its poor financials made it difficult for the company to raise money to avoid insolvency.  *Id.* ¶ 36.

Other contemporaneous documents from 2009-2010 show that DNAML's failure had nothing to do with the agency pricing model.  During that time, DNAML was focused on finding a buyer for its business.  *Id.* ¶¶ 45-48.  E-book sales were still a tiny portion of DNAML's business.  *Id.* ¶ 60.  By March 2009, despite nearly a decade in the e-book industry, DNAML "had not proven that we can run a profitable software business, and we don't know enough about online retailing," so that "only in the hands of a big player" could DNAML utilize its technology.  *Id.* ¶ 30.  DNAML did not think that its e-book retail platform was likely to be a valuable part of its business.  *Id.* ¶¶ 22, 28.  Further, DNAML "d[id] not have a strategic solution to the conundrum that it would be very hard to run a viable on-line ebook store with only books that are available on our software in stock," and could "never afford the cost of negotiating and converting the many thousands of books we need to achieve real volume."  *Id.* ¶ 25.  Both before and after agency, DNAML failed to raise interest from potential buyers, who did not believe in DNAML's technology.  *Id.* ¶¶ 35-37, 55-59.  Yet during this time, DNAML never lamented its inability to discount e-books, nor complained of any harmful effects from agency.  There is simply no evidence that agency harmed DNAML.

Thus, much like the plaintiff in *Argus*, DNAML cannot establish but-for causation because it was in dire financial condition prior to agency and was going to fail even if agency were never adopted.  DNAML was unprofitable, had never acquired an appreciable market share, was shrinking its workforce, and was struggling to raise capital or interest from acquirers.  *See Argus*, 801 F.2d at 43-45; *Argus*, 612 F. Supp. at 920-21.  And DNAML's "contemporaneous

18

documents . . . conclusively contradict [its] litigation stance" and instead show that DNAML did not price e-books "aggressively" and was struggling to survive before the adoption of agency. *See Argus*, 612 F. Supp. at 921-22; *see also Argus*, 801 F.2d at 43.  Moreover, the record is devoid of any contemporaneous evidence supporting DNAML's allegations that the inability to discount e-book prices led to its failure as a company.  Accordingly, DNAML will be unable to establish causation-in-fact at trial and its claims fail.

### B.   DNAML Cannot Distinguish Its Alleged Damages From Those Resulting From Causes Other Than The Alleged Conspiracy

Even if DNAML could establish that it was financially viable prior to agency, its claims still cannot overcome summary judgment because the evidence shows that numerous factors unrelated to agency pricing were the material and substantial causes for DNAML's demise.  To prove causation, a plaintiff need not "exhaust all possible alternative sources of injury," but it must show that the alleged conspiracy is "a material cause of the injury."  *Zenith Radio Corp.*, 395 U.S. at 114 n. 9.  "[A] plaintiff must make some showing of 'actual injury attributable to something the antitrust laws were designed to prevent.'"  *Intimate Bookshop v. Barnes & Noble, Inc.*, No. 98 Civ. 5564 (WHP), 2003 WL 22251312, at *3 (S.D.N.Y. Sept. 30, 2003) (internal citations omitted).  Where there are numerous other reasons for a company's failures, a plaintiff cannot show that an alleged antitrust violation was the cause.  *See Greater Rockford*, 998 F.2d at 403-04 (granting summary judgment where the alleged antitrust violation was one out of nine causes and there seemed to be no way of weighting them); *Intimate Bookshop*, 2003 WL 22251312, at *7-8 (finding that plaintiff's "unsupported assumption of causation and supposition that all of its losses were caused by defendants' allegedly unlawful conduct, and failure to account for defendants' lawful conduct and intervening market factors are fatal to its claim"); *Argus*, 801 F.2d at 43-45 (affirming summary judgment where company's contemporaneous documents attributed failures to problems other than alleged anticompetitive conduct).[8]

---

[8] *See also* Areeda, Antitrust Law, ¶ 338 (Causation and Injury-In-Fact) ("[W]hen other forces overwhelm the alleged violation in explaining the plaintiff's situation, then the violation would not be a significant, substantial, or material cause.").

The evidence—including contemporaneous business documents and testimony by DNAML's CEO—establishes eighteen issues wholly unrelated to agency pricing that harmed DNAML's business.  Indeed, DNAML and its advisors and investors identified the following issues, each of which contributed to DNAML's demise and were unrelated to agency pricing:

1. Pricing that resulted in "the most expensive eBooks on the web" which DNAML "knew would prevent sales" (56.1 Stmt. ¶ 64);

2. DNAML's proprietary e-book formats could only be read on DNAML software, and were only sold by DNAML's retail store (*id.* ¶ 9);

3. DNAML's failure to develop an app for Apple iOS devices (Ex. 11 (Compl.) ¶ 95);

4. DNAML's inability to offer a wide selection of e-books in its format, and its inability to offer all of its titles in both of its formats (56.1 Stmt. ¶¶ 9-10);

5. DNAML's failure to develop a proprietary device to read e-books (*id.* ¶¶ 9-13);

6. DNAML's inability to sell e-books to certain proprietary devices provided by major retailers, such as Amazon's Kindle (*id.* ¶ 11);

7. DNAML's long-delayed app for Android devices (*id.* ¶ 11);

8. DNAML's inability to raise capital without guaranteeing investments (*id.* ¶¶ 15, 18);

9. Delays in meeting product deadlines resulting in a loss of revenues necessitating layoffs (*id.* ¶ 20);

10. A lack of resources and expertise necessary to become a major player in online retailing (*id.* ¶ 29);

11. DNAML's CEO's decisions to limit fundraising to prevent his shareholding from being watered down (*id.* ¶¶ 34, 37);

12. Financial mismanagement that caused shareholders to restrict control of funds used by DNAML (*id.* ¶¶ 38-40);

13. DNAML's CEO's decision-making based on his own—rather than the company's— interests (*id.* ¶ 38);

14. DNAML's CEO's lack of "understanding of corporate governance" leading to DNAML's Chairman's resignation (*id.*);

15. An inability to attract investors or acquirers due to reasons including a lack of revenues, major projected losses, and lack of desirable products (*id.* ¶¶ 27, 32, 36-37, 43, 55-58);

16. DNAML's lack of resources and investment in sales and marketing compared with its competitors led to flat e-book sales in a year when global e-book sales grew (*id.* ¶ 56);

17. DNAML's products seemed "unfinished or buggy" (*id.* ¶ 58); and

18. The inability to implement the technology necessary for customers to redeem coupons. *Id.* ¶ 66.

Taken together, these alternative factors that harmed DNAML defeat Plaintiff's claims, because DNAML cannot prove that agency pricing—rather than these factors—was a substantial factor or material cause of its collapse. *See Greater Rockford*, 998 F.2d at 403-04 ("Standing alone one of these alternative causes of the plaintiffs' injuries might be insufficient to put causation-in-fact in question. Taken together, however, the plaintiffs have failed to show with a fair degree of certainty that 'but for' the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain."). Rather, these alternative causes that led to DNAML's failure—identified in real time by DNAML, its investors, and its advisers—defeat Plaintiff's claims, as the Second Circuit has recognized. *See Argus*, 801 F.2d at 42-43, 45 ("The failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim. It is thus a telling blow to plaintiff's…theory that [the plaintiff's] contemporaneous accounts of the reasons for its economic ailments consistently contradict its present position." (citations omitted)).

To survive summary judgment, DNAML should have accounted for and disaggregated these other factors. *See United Mag. Co. v. Murdoch Mag. Distribution, Inc.*, 393 F. Supp. 2d 199, 212 (S.D.N.Y. 2005) (granting summary judgment where "plaintiffs have failed to account for these other causes" of its alleged injury); *Intimate Bookshop*, 2003 WL 22251312, at *4 ("[Plaintiff] must make some showing that the injury to its business was not caused by factors unrelated to the defendant's [alleged antitrust violation]."). DNAML has not made such a showing, nor could it. Nor did DNAML's causation expert conclude that the alleged conspiracy was the sole cause of its injuries. Instead, without any detailed analysis or consideration of the contemporaneous record, DNAML's causation expert simply assumed that the Publisher Defendants' actions harmed DNAML and concludes: "I have considered various alternative

causes to the degree needed for me to render reliably the opinions I express in this report." Ex. 8 (Ratliff Report) ¶¶ 18, 21; *see also* Ex. 6 (Ratliff Dep.) 136:5-140:9.[9]  As Defendants' expert explained, though, there is no reason to credit this conclusion because numerous other factors likely harmed DNAML's business.  Ex. 9 (Carlton Report) ¶ 52.

DNAML's damages expert likewise failed to disaggregate harm attributable to factors other than the alleged conspiracy.  Ex. 7 (Rosen Dep.) 70:12-17 ("I'm attributing the main causation to the agency model, the antitrust violations.  If the court determines that there's other factors and wants to sort of reduce damages for that effect, *I guess they could do that.  I've not done that calculation.*") (emphasis added); *see also id.* at 70:7-71:03.  This failure warrants summary judgment for Defendants, because an antitrust plaintiff must distinguish between losses attributable to the alleged antitrust violations and losses attributable to other factors.  *See, e.g.*, *U.S. Football League*, 842 F.2d at 1378-79 (because damages "must be traced to some degree to unlawful acts," plaintiffs must segregate losses caused by defendant's misconduct from "losses caused by other factors, such as management problems"); *see also Comcast v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  Because DNAML and its experts do not and cannot meaningfully account for any of the numerous alternative causes for its failure, DNAML cannot raise a triable issue of fact as to causation.  *See United Mag. Co.*, 393 F. Supp. at 213; *Intimate Bookshop*, 2003 WL 22251312, at *7-8 ("[Plaintiff's] unsupported assumption of causation and supposition that all of its losses were caused by defendants' allegedly unlawful conduct, and failure to account for defendants' lawful conduct and intervening market factors are fatal to its claim.").

### C.    Plaintiff Cannot Rely On After-the-Fact Explanations to Create an Issue of Material Fact to Defeat Summary Judgment

As noted above, while DNAML asserts that it "was forced to cease its e-book retail operations" after the adoption of the agency model, *see* Ex. 11 (Compl.) ¶ 3, that theory finds no

---

[9] Ratliff's main argument in response to the presence of alternative causes is that no other causes for Plaintiff's failure coincide with the sharp downturn in revenues for BooksOnBoard and Diesel.  Ex. 10 (Ratliff Reply) ¶¶ 16; 161-164.  This analysis does not relate to DNAML.  And Ratliff does not address the fact that DNAML had agreements to sell e-books from only two of the five Publisher Defendants.  Further, Ratliff's argument does not excuse the failure to analyze the effects of any alternative causes on DNAML's business.

support from contemporaneous documents created while DNAML was in business which delineate the actual reasons DNAML was failing. *See supra* § II.B.  Such after the fact litigation constructs that are contrary to contemporaneous evidence cannot create a genuine issue of material fact. *See Argus*, 801 F.2d at 45 ("Such [conclusory] testimony [by plaintiffs' officers and employees], unsupported by documentary or other concrete evidence . . . , is simply not enough to create a genuine issue of fact in light of the evidence to the contrary."); *United Mag. Co.*, 393 F. Supp. 2d at 211-12 (holding that a self-serving affidavit unsupported by evidence does not constitute "evidence from which a reasonable jury could conclude" causation of antitrust injury).

The Second Circuit's decision in *Argus* is particularly applicable.  In affirming the district court's grant of summary judgment for the defendant on plaintiff's Section 1 claims, the Second Circuit gave great weight to contemporaneous explanations for plaintiffs' "economic ailments" that had nothing to do with the antitrust violation while discounting self-serving, "tactically convenient" testimony that lacked the same support. *Argus*, 801 F.2d at 42-43.[10]  The court similarly rejected the testimony and submissions of plaintiffs' expert on causation because his "naked conclusion" was unsupported and could not "rebut the volume of evidence to the contrary." *Id.* at 46.

Here, as in *Argus*, DNAML cannot rely solely on self-serving, after-the-fact testimony and naked conclusions from its causation expert because the contemporaneous documents identify numerous issues other than agency pricing as the reason for DNAML's failures, as discussed above.  DNAML's CEO and investors repeatedly discussed other reasons for DNAML's struggles, despite having many opportunities to identify agency pricing and the inability to discount as the cause of DNAML's problems.  In fact, the record is devoid of references to agency pricing negatively impacting DNAML's business.  DNAML's CEO

---

[10] The plaintiffs in *Argus*, as in this case, attempted to follow a successful Section 1 claim by differently-situated plaintiffs by claiming injury from the same conspiracy.  Both the district court and the Second Circuit held that the *Argus* plaintiffs could not recover under the antitrust laws, even assuming that the defendant's conduct was unlawful. *See Argus*, 612 F. Supp. at 918-919; *Argus*, 801 F.2d at 39.

testified that he began discussing the negative effects of agency pricing as soon as he understood that agency was a "disaster" for DNAML, and testified that these discussions began in January 2010, soon after DNAML learned details about the agency pricing model.  Ex. 3 (Schmidt Dep.) 204:18-206:23.  Schmidt now claims that agency pricing was a "disaster" because DNAML acquired customers "through price discounting and bundling and so forth."  *Id.*  These after-the-fact claims, like DNAML's allegations in its complaint, are flatly contradicted by DNAML's contemporaneous records.  DNAML could not identify any specific conversations, or a single document reflecting such conversations, regarding DNAML's negative reaction to agency.  *See* Ex. 80 (Response to Second Set Interrogatory No. 3).

As noted above, DNAML was not a discounter.  It did not attract customers through price discounting and bundling, but sold almost all of its titles at prices well above any of its competitors.  Its few attempts at discounting failed to attract customers.  56.1 Stmt. ¶¶ 61, 65-68. Further, Schmidt's claim that he immediately recognized that agency was a "disaster" for DNAML is directly contradicted by his numerous statements touting the benefits of agency for DNAML, both before and after agency pricing began.  *Id.* at ¶¶ 51-52.  It is further contradicted by the record evidence identifying the many other causes of its eventual failure.  *See*, *supra* § II.B.  The substantial volume of contemporaneous evidence showing that agency pricing was not a material cause or substantial factor in DNAML's failure necessarily outweighs after-the-fact, self-serving testimony from DNAML or its expert, and thus, this testimony cannot create a genuine issue of fact to defeat summary judgment.  *See Argus*, 801 F.2d at 45 (holding that "conclusory testimony" from plaintiffs' officers and employees "falls woefully short of that necessary to outweigh the volume of contrary facts in the record" and that plaintiffs' expert could not defeat summary judgment because his conclusion was "unsupported and thus inadequate to rebut the volume of evidence to the contrary").

## III.   DNAML HAS NO STANDING TO BRING AN ANTITRUST CLAIM

In addition to the numerous reasons elucidated above, DNAML's claim fails because it cannot establish standing to bring this action.  "Old DNAML," which no longer exists, is the

entity that was in existence during the relevant time frame and that was purportedly harmed by the alleged conspiracy.  Ex. 3 (Schmidt Dep.) at 17:22-18:12, 13:21-14:5; Ex. 62 (DNAML Dep. Ex. 21).  However, DNAML has not shown any express assignment of U.S. antitrust claims, and the asset transfer agreement (from Old DNAML to Plaintiff in December 2011) is silent on the issue.  Ex. 62 (DNAML Dep. Ex. 21).  An express assignment of antitrust claims is required to confer standing.  *See, e.g.*, *Sullivan v. National Football League*, 34 F.3d 1091, 1106 (1st Cir. 1994) (the term "all other assets" in sale contract did not operate to transfer antitrust claims "[a]bsent some express language to the effect that Sullivan was selling his football related 'antitrust claims'"); *Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.*, No. 95-CV-7574-S(S), 1998 U.S. Dist. LEXIS 23084 (W.D.N.Y. July 7, 1998) ("absent an express reference including the antitrust claim against [Defendant] in the asset transfer, the court should not impute such a transfer").  Nothing in the asset-transfer agreement provides for the assignment—express or otherwise—of any antitrust or other claims.  Ex. 62 (DNAML Dep. Ex. 21).  This dooms DNAML's claim for lack of standing.  *Id.*; *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437-40 (3d. Cir. 1993); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2007 U.S. Dist. LEXIS 61373 (N.D. Cal. Aug. 4, 2007).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor.

Dated: New York, New York
 September 18, 2015

Respectfully submitted,


 _/s/ Yehudah L. Buchweitz_

James W. Quinn
Yehudah L. Buchweitz
Jeff L. White
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Tel.:     (212) 310-8000
Fax:     (212) 310-8007

james.quinn@weil.com
yehudah.buchweitz@weil.com
jeff.white@weil.com

*Attorneys for Defendant*
*Simon & Schuster, Inc.*


 _/s/ Michael Lacovara_

Michael Lacovara
Richard Snyder (*pro hac vice*)
Samuel J. Rubin
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue 31st Fl.
New York, NY 10022
Tel.:     (212) 277 4000
Fax:     (212) 277 4001

michael.lacovara@freshfields.com
richard.snyder@freshfields.com
samuel.rubin@freshfields.com

*Counsel for Defendant*
*Hachette Book Group, Inc.*


 _/s/ Saul P. Morgenstern_

Saul P. Morgenstern
Amanda C. Croushore
Margaret A. Rogers
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel.:     (212) 836.7210
Fax:     (212) 836-6333

saul.morgenstern@kayescholer.com
amanda.croushore@kayescholer.com
margaret.rogers@kayescholer.com

*Attorneys for Defendant*
*Penguin Group (USA) Inc.*


 _/s/ Charles Scott Lent_

C. Scott Lent
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Tel:     (212) 715-1784
Fax:     (212) 715-1399

scott.lent@aporter.com

*Attorneys for Defendant*
*HarperCollins Publishers LLC*

_/s/ Joel M. Mitnick_

Joel M. Mitnick
John Lavelle
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Tel.:       (212) 839-5300
Fax:       (212) 839-5599

jmitnick@sidley.com
jlavelle@sidley.com

*Attorneys for Defendants
Macmillan Publishers Inc., and  Verlagsgruppe
Georg Von Holtzbrinck GmbH*

_/s/ Theodore J. Boutrous, Jr_

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER, LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.:       (213) 229-7000

tboutrous @ gibsondunn.com

Lawrence J. Zweifach
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, NY 10166-0193
Tel.:       (212) 351-4000

Cynthia Richman
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Tel.:       (202) 955-8500

*Attorneys for Defendant
Apple Inc.*