```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
DNAML PTY, LIMITED,                      :
                                         :            13cv6516 (DLC)
                Plaintiff,               :
                                         :            OPINION & ORDER
        -v-                              :
                                         :
APPLE INC.; HACHETTE BOOK GROUP,         :
INC.; HARPERCOLLINS PUBLISHERS, LLC;     :
VERLAGSGRUPPE GEORG VON HOLTZBRINCK      :
GMBH; HOLTZBRINCK PUBLISHERS, LLC        :
d/b/a/ MACMILLAN; THE PENGUIN GROUP, A   :
DIVISION OF PEARSON PLC; and SIMON &     :
SCHUSTER, INC.,                          :
                Defendants.              :
                                         :
---------------------------------------- X
```

APPEARANCES:

For plaintiff DNAML PTY, Ltd.:

Michael J. Guzman
Derek T. Ho
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC
Sumner Square
1615 M Street, N.W., Ste. 400
Washington, D.C. 20036

For defendants:

For Apple Inc.:

Theodore J. Boutrous, Jr.
Daniel G. Swanson
Gibson, Dunn & Crutcher, LLP
333 South Grand Ave.
Los Angeles, CA 90071

Lawrence J. Zweifach
Gibson, Dunn & Crutcher, LLP
200 Park Ave.
New York, NY 10166

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036

For Simon & Schuster, Inc.:

James W. Quinn
Yehudah L. Buchweitz
Jeff L. White
Weil Gotshal & Manges LLP
767 Fifth Ave.
New York, NY 10153

For Penguin Group (USA) Inc.:

Saul P. Morgenstern
Amanda C. Croushore
Margaret A. Rogers
Kaye Scholer LLP
425 Park Ave.
New York, NY 10022

For Hachette Book Group USA, Inc.:

Michael Lacovara
Richard Snyder
Samuel J. Rubin
Freshfields Bruckhaus Deringer US LLP
601 Lexington Ave.
New York, NY 10022

For HarperCollins Publishers LLC:

C. Scott Lent
Arnold & Porter LLP
399 Park Ave.
New York, NY 10022

For Macmillan Publishers Inc. and Verlagsgruppe Georg Von Holtzbrinck GmbH:

Joel M. Mitnick
John Lavelle
Sidley Austin LLP
787 Seventh Ave.
New York, NY 10019

DENISE COTE, District Judge:

DNAML Pty, Ltd. ("DNAML") brings this action against Apple Inc. ("Apple") and five book publishers ("Publisher Defendants") (collectively "Defendants"), pursuant to Section 1 of the Sherman Antitrust Act, to recover damages DNAML asserts it sustained due to the Defendants' conspiracy to fix prices and reduce competition in the e-book industry. Following the completion of fact discovery, the Defendants have moved for summary judgment on several grounds, including DNAML's lack of standing. Because the plaintiff was not the entity injured by the violation of the antitrust laws alleged here, and did not receive an assignment of the right to pursue this claim from the injured party, it lacks standing to bring its antitrust claim and the defendants' motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed or taken in the light most favorable to plaintiff. The business that became DNAML was first established in 1999 as 1st Element Pty ("1st Element"). In 2000 and 2001, 1st Element transferred its assets to DNAML Pty, Ltd. ("Old DNAML") in return for 960,000 shares of Old DNAML. As explained by their CEO, these businesses were focused on providing solutions for the electronic publishing industry. Among other things, Old DNAML developed a proprietary digital rights management system as well as a proprietary e-book format

known as ".DNL." DNAML sold e-books published by only two of the five Publisher Defendants, Hachette Book Group USA, Inc. ("Hachette") and HarperCollins Publishers LLC ("HarperCollins").

In early 2010, the Publisher Defendants adopted an agency model for the distribution of e-books. DNAML alleges that the Publisher Defendants adopted this model pursuant to their participation with Apple in an antitrust conspiracy. On March 1, 2010, DNMAL entered into an agency agreement that gave Hachette the right to "determine the retail price of each Digital Book . . . and all price policies applicable to sales to end users . . . ." While DNAML began negotiating an agency agreement with HarperCollins in early 2010, the agreement was never finalized.

Plaintiff alleges that the Defendants' adoption of the agency model directly harmed Old DNAML and caused it to go out of business. According to the plaintiff, Old DNAML's "business model was predicated on aggressive price competition" and the implementation of the Defendants' agency model in January 2010 destroyed retail price competition and "forced" DNAML to price e-books in line with other sellers, making Old DNAML "unable to distinguish itself through offering attractive prices, offering innovative means to purchase e-books through bundles or loyalty

rewards, [and] attractive cross-platform support." By September 2010, Old DNAML had decided to cease its e-book retail business.

On December 23, 2011, well after the implementation of the agency model and DNAML's decision to shut down its e-book retail business, Old DNAML executed an Asset Purchase Agreement (the "Agreement") through which it transferred all of its assets to a newly formed entity referred to as ACN 154 689 111 Pty LTD ("New DNAML" or "DNAML"). In the Agreement, New DNAML purchased the "Business and Assets free of any Security Interest" of Old DNAML in exchange for $14,000 and the assumption of all of Old DNAML's liabilities. "Assets" is defined as "all of the assets owned by the Vendor and used in connection with the Business including its cash, the Book Debts, the DNAML UK Shares, the Business Agreements, Leasehold Property interest, Equipment, Intellectual Property, and the Goodwill." "Business" is defined as "the business carried on by the Vendor, being the business of owning and operating eBook technologies, including the sale of eBooks." According to the plaintiff, Old DNAML continues to exist but has no active business.

Beginning on August 9, 2011, American class action complaints were filed against the Defendants alleging violations of the Sherman Act, culminating in a consolidated amended complaint filed on January 20, 2012. In re Elec. Books Antitrust Litig., 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012). On

April 11, 2012, the Department of Justice and various States filed antitrust lawsuits against the Defendants. The Publisher Defendants settled these actions. Apple proceeded to trial and was found liable in July 2013. United States v. Apple Inc., 952 F. Supp. 2d 638, 709 (S.D.N.Y. 2013).

On September 16, 2013, DNAML filed this action alleging that Apple and the Publisher Defendants conspired to unreasonably restrain trade in violation of the Sherman Act, 15 U.S.C. § 1. On June 5, 2014, the Defendants' motion to dismiss was largely denied. DNAML Pty, Ltd. v. Apple Inc., 25 F. Supp. 3d 422, 432 (S.D.N.Y. 2014). On September 18, 2015, following the completion of fact discovery, the Defendants filed a joint motion for summary judgment. The Defendants argue that DNAML cannot show antitrust injury, that the failure of Old DNAML's business was not caused by the alleged conspiracy, and that New DNAML lacks standing to bring an antitrust claim. The motion was fully submitted on October 31. Because New DNAML lacks standing to pursue claims stemming from antitrust injuries allegedly inflicted on Old DNAML, it is unnecessary to address the remaining grounds the Defendants advance for summary judgment.

**DISCUSSION**

The Defendants argue that DNAML's claim fails because it cannot establish standing to bring this action. Section 4 of

the Clayton Act establishes a private right of action for violations of the federal antitrust laws. It entitles "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws" to treble damages. 15 U.S.C. § 15. As the Supreme Court has explained, in passing this law, "Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by . . . combinations that dominated certain interstate markets." Associated Gen. Contractors of Ca., Inc. v. Ca. State Council of Carpenters, 459 U.S. 519, 530 (1983). Congress "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Id. at 534 (citation omitted). Accordingly, courts have imposed "boundaries" on the invocation of this private enforcement tool to ensure that an action for treble damages is invoked in service of "the purpose of the antitrust laws: to protect competition." Gatt Commc'ns, Inc. v. PMC Assoc., LLC, 711 F.3d 68, 75 (2d Cir. 2013). There are "two imperatives" for antitrust standing. Id. at 76. A plaintiff must plausibly plead both that it suffered an antitrust injury and that it is an efficient enforcer of the antitrust laws. Id.

It is undisputed that Old DNAML, not the plaintiff, was the only entity in existence during and allegedly harmed by the antitrust conspiracy which resulted in the adoption of the

agency model by the Publisher Defendants in early 2010.  DNAML thus does not dispute that it lacks standing to sue absent an assignment of antitrust claims from Old DNAML.  The parties do dispute, however, whether Old DNAML successfully assigned its antitrust claims to New DNAML almost two years later through the Agreement of December 23, 2011.

The first issue is whether federal antitrust claims may be assigned by the injured party to another.  Whether a federal antitrust claim may be assigned is itself a matter of federal law.  In the words of the Hon. John Gibbons, "it would be intolerable to permit the states to determine the transferability and thus the value, of interests created by federal law."  Lowry v. Baltimore & Ohio R. Co., 707 F.2d 721, 739 (3d Cir. 1983) (Gibbons, J., dissenting).  Concluding that the issue of assignability of a federal statutory claim is itself an issue of federal law is entirely consistent with ordinary choice of law principles.  Under virtually all choice-of-law regimes, the jurisdiction's law that governs whether a cause of action exists will also be the jurisdiction that decides whether that cause of action can be assigned.  See Caleb Nelson, The Persistence of General Law, 106 Colum. L. Rev. 503, 544 (2006).  Although federal antitrust laws do not expressly permit assignment, it has been long acknowledged by federal courts that these claims may be assigned.  See, e.g., In re Fine

Paper Litig. State of Wash., 632 F.2d 1081, 1090 (3d Cir. 1980) (the Sherman and Clayton Acts); see also Bluebird Partners, L.P. v. First Fid. Bank, N.A. N.J., 85 F.3d 970, 973 (2d Cir. 1996) (federal securities laws).

Having determined that the plaintiff's claims are subject to assignment, the next issue is what law will be used to determine whether its causes of action have been validly assigned. There is, of course, "no federal general common law." Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). In the absence of congressional guidance on the issue of what law to apply, courts look to the three-part test enunciated by the Supreme Court in United States v. Kimbell Foods, Inc., 440 U.S. 715, 728-29 (1979), to determine whether to create a uniform federal standard or to incorporate state law. VKK Corp. v. Nat'l Football League, 244 F.3d 114, 122 (2d Cir. 2001). Under Kimbell Foods, courts determining whether federal common law should displace state law must consider whether: "(1) the issue requires a nationally uniform body of law; (2) application of state law would frustrate specific objectives of the federal programs; and (3) application of a federal rule would disrupt commercial relationships predicated on state law." VKK Corp., 244 F.3d at 122 (citation omitted); see also New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 207 (2d Cir. 2006). The Supreme Court concluded long ago that the first two sections of

the Sherman Act, with their "sweeping language," are among those instances in which courts are empowered to create governing rules of law. Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 644 (1981). "The legislative history [of the Sherman Act] makes it perfectly clear that [Congress] expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." Id. at 643.

Accordingly, it is unsurprising that Courts of Appeals have fashioned a uniform rule for the assignment of a federal antitrust claim. To effect a transfer of the right to bring an antitrust claim, the transferee must expressly assign the right to bring that cause of action, either by making specific reference to the antitrust claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim.

In Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425 (3d Cir. 1993) ("Gulfstream"), the Third Circuit applied federal common law to find that the assignment of antitrust claims must be express. Id. at 437-38. The court held that under federal common law, a general assignment of "rights, title and interest in and to" an aircraft and a purchase agreement for an aircraft was insufficient to validly assign a federal antitrust claim. Id. at 431, 438. The court explained that "a general assignment would be disfavored under

the direct purchaser rule" because of the "highly speculative inquiries" required to determine "the relative extent of injury incurred by the direct or remote purchasers."[1] Id. at 439. Thus, "any assignment of antitrust claims, as a matter of federal common law, must be an express assignment; general assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims." Id. at 440; see also Knott v. McDonald's Corp., 147 F.3d 1065, 1068 n.4 (9th Cir. 1998) (noting the "unique concerns underlying antitrust assignments"); Sullivan v. Nat'l Football League, 34 F.3d 1091, 1106 (1st Cir. 1994) (finding that a transfer of "all

---

[1] The "direct purchaser" rule states that "only direct purchasers have standing to bring civil antitrust claims." Simon v. KeySpan Corp., 694 F.3d 196, 201 (2d Cir. 2012). The rule stems from Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 467-94 (1968), which held that a Clayton Act defendant could not assert a defense that the plaintiff had suffered no injury because it had passed on any illegal overcharges to consumers. Illinois Brick Co. v. Illinois then made this rule bilateral by holding that only direct purchasers of concrete blocks produced by manufacturer Illinois Brick Co. could pursue price-fixing claims against the manufacturer. 431 U.S. 720, 730 (1977). In Illinois Brick, the Supreme Court laid out two rationales for the direct purchaser rule. First, defendants may otherwise face a serious risk of multiple liability. Id. Second, there are too many "uncertainties and difficulties in analyzing price and out-put decisions in the real economic world rather than an economist's hypothetical model." Id. at 731-32 (citation omitted). "In other words, it is nearly impossible for a court to determine which portion of an overcharge is actually borne by the direct purchaser and which portion is borne by a subsequent indirect purchaser." Simon, 694 F.3d at 202.

other assets" to buyers did not include antitrust cause of action). Cf. Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't Co., 105 F.3d 210, 218 (5th Cir. 1997)(requiring express assignment of ERISA claim); Bluebird Partners, 85 F.3d at 974 (rejecting automatic assignment of federal securities claim with sale of the security). While the Third Circuit later relaxed its rule, in the context of an assignment of a Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., claim, to include the express assignment of "all . . . causes of action, claims and demands of whatsoever nature," Lerman v. Joyce Int'l Inc., 10 F.3d 106, 112 (3d Cir. 1993) (citation omitted), it has continued to insist that the assignment of claims be express.

The requirement that the assignment of claims be express is fully consistent with general principles of contract law. As a matter of common law, the right to bring a "chose in action" was a personal right separate from the property that gave rise to the right. Sprint Comm. Co., L.P v. APCC Servs., Inc., 554 U.S. 269, 275-79 (2008) (describing the history of common law choses in action); see also W. S. Holdsworth, The History of the Treatment of Choses in Action by the Common Law, 33 Harv. L. Rev. 997, 1008 (1920). Accordingly, the transfer of property was a separate act from the transfer of a right incident to the property. See David C. Profilet, Express Versus Automatic

Assignment of Section 10(b) Causes of Action, 1985 Duke L.J. 813, 818 (1985). There was no presumption of an automatic assignment of the right to bring a claim associated with the property when the property was sold. See, e.g., Wilson v. Haley Live Stock Co., 153 U.S. 39, 46 (1894) (trespass cause of action did not run with cattle sale); see also Indep. Inv'r Protective League v. Saunders, 64 F.R.D. 564, 572 (E.D. Pa. 1974) (While a cause of action "may be transferred . . . by express assignment," the causes of action belonging to a prior holder of a security "do not pass with the transfer of the security."); Profilet, supra, at 822-23. Instead, the law has required an express assignment of the right to bring a cause of action.

This principle is reflected in the Restatement of Contracts, which requires an assignor to "manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee." Restatement (Second) of Contracts § 324; see also 29 Williston on Contracts § 74:3 (4th ed.).[2] For example, under New York law "where the assignment of a fraud or other tort claim is intended in conjunction with the conveyance of the contract or note, there

---

[2] While the manifestation of intent "may be made orally or by a writing," since the Statute of Frauds applies to any assignment, an oral assignment is ineffective when the value of the assigned right is $5,000 or greater. Restatement (Second) of Contracts § 324 cmt. b (1981); see also U.C.C. § 1-206.

must be some language -- although no specific words are required -- that evinces that intent and effectuates the transfer of such rights." Commonwealth Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., 25 N.Y.3d 543, 550 (2015); see also Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57 F.3d 146, 151 (2d Cir. 1995) ("Under New York law, the assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract."); Coca-Cola Bottling Co. v. Coca-Cola Co., 654 F. Supp. 1419, 1442 (D. Del. 1987) (finding that specific rights conveyed by assignors did not include right to enforce provision of consent decree). By ensuring that the parties' expressed intent determines who receives redress for a wrong, the value of the cause of action will be figured into any sale of property, and a purchaser will be less likely to realize a windfall. See Profilet, supra, at 830.

In determining whether the Agreement has effectively made an assignment of the right to bring an antitrust claim, ordinary principles of contract law will be applied.[3] "A fundamental precept of contract law is that agreements are to be construed in accordance with the parties' intent," "the best evidence" of

---

[3] The Agreement does not contain a choice of law provision, nor do the parties argue for the application of any law outside of the Third Circuit's federal common law framework.

14

which "is what they say in their writing." In re World Trade Ctr. Disaster Site Litig., 754 F.3d 114, 122 (2d Cir. 2014) (citing New York law) (citation omitted). "Accordingly, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. (citation omitted). Thus, "[a]t the outset, the court must determine whether the language the parties have chosen is ambiguous . . . ." Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir. 2013).

"A contract is unambiguous when the contractual language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014). "By contrast, ambiguity exists where a contract's term could objectively suggest more than one meaning to one familiar with the customs and terminology of the particular trade or business." Id. "Whether a contract is ambiguous is a question of law." Id. But ambiguity does not arise merely by virtue of the fact that the parties volunteer different definitions. Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010). For instance, the proposal of an interpretation that "strains the contract language beyond its reasonable and ordinary meaning" does not create ambiguity where none otherwise exists. Seiden Assocs., Inc. v. ANC Holdings,

Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citation omitted). "The existence of an ambiguity is to be ascertained from the face of an agreement without regard to extrinsic evidence." In re World Trade Ctr. Disaster Site Litig., 754 F.3d at 122 (citation omitted).

The Agreement does not assign antitrust claims from Old DNAML to New DNAML. The Agreement contains no express assignment of Old DNAML's antitrust claims, and no general assignment of all claims. While the Agreement transfers all of Old DNAML's "Business and Assets" to New DNAML, neither the term "Assets" nor "Business" is defined in the Agreement to include claims of any kind. As explained above, a transfer of assets does not effect an assignment of antitrust claims. See, e.g., Sullivan, 34 F.3d at 1106 (transfer of "all other assets" did not include antitrust cause of action).

Where the Agreement intended to transfer legal claims, it made that intention explicit. The Agreement states that Old DNAML "assign[ed] to [New DNAML] all the rights which [Old DNAML] may have under, and against the other party or parties to, the Business Agreements and Licenses and Trading Agreements . . . ." "Business Agreements" is defined as "the current uncompleted agreements entered into in connection with the Business at the Settlement Date." "Licenses and Trading Agreements" is defined as "the Vendor's rights, licenses and

trading arrangements in connection with the Business." Applying the principle expressio unius est exclusion alterius, the inclusion of these specific transfer provisions confirms that the parties to the Agreement were aware of how to transfer legal claims, chose to transfer specific rights that they delineated, and did not intend a general transfer of all legal claims. Cf. Matter of New York City Asbestos Litig., 838 N.Y.S.2d 76, 80 (1st Dep't 2007). Notably, plaintiff does not argue that this assignment provision effected a transfer of antitrust claims from Old DNAML to New DNAML.

DNAML argues that the purchase of Old DNAML's "Business" was sufficiently "unambiguous and all inclusive" to effect an assignment of federal antitrust claims under the standard described in Lerman. See Lerman, 10 F.3d at 112. Plaintiff notes that the Agreement provides that "a reference to a thing includes each part of that thing" and argues that the Agreement's reference to DNAML's e-book "Business" should therefore be read to include litigation claims arising from that business. First, DNAML misreads Lerman, which holds only that there may be a sufficient assignment of antitrust claims if there is an express assignment of all causes of action. See Sullivan, 34 F.3d at 1106 (describing Lerman). Second, the Agreement's definition of "Business," which is defined as the "business of owning and operating eBook technologies," is not an

17

"express" assignment of any accrued legal claims, much less accrued antitrust claims. The "business of owning and operating eBook technologies" does not plainly include bringing antitrust claims in court.[4]

Finally, the plaintiff offers 2015 deposition testimony and a 2011 email as evidence that the asset transfer from old DNAML to New DNAML was intended to include antitrust claims.[5] Since the Agreement is unambiguous, it would be inappropriate to turn to extrinsic evidence to supplement its terms. See In re World Trade Ctr. Disaster Site Litig., 754 F.3d at 122. The Agreement does not expressly transfer Old DNAML's antitrust

---

[4] The plaintiff relies as well on Vasilliow Co., Inc. v. Anheuser-Busch, Inc., 117 F.R.D. 345, 347 (E.D.N.Y. 1987), for the proposition that a transfer of all corporate assets effects an assignment of antitrust claims. In that brief decision, the court dismissed individual claims brought by one class representative on standing grounds because the plaintiff "agreed to sell all of its business assets" and "[t]he contract does not exempt from the sale of assets this or any other cause of action." The decision did not cite or grapple with any of the precedent or legal principles discussed above. Accordingly, it does not provide a basis to depart from the analysis undertaken here.

[5] In the 2011 email discussing the Agreement, DNAML CEO Adam Schmidt states that "[t]he net effect on the going concern is zero -- the new company assumes all the Assets and Liabilities of DNAML." Even if it were appropriate to consider this extrinsic evidence, and it is not, this reference to the transfer of assets does not evidence an intent to assign legal claims.

claims to New DNAML, nor do the written terms of the Agreement manifest an intent to do so.

**CONCLUSION**

The Defendants' September 18 motion for summary judgment is granted and the claims asserted in this action are dismissed with prejudice. The Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York
December 16, 2015

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　DENISE COTE
　　　　　　　　　　　　　　　　United States District Judge